## GREAT ATLANTIC & PACIFIC TEA CO., INC.
## *v.* COTTRELL, HEALTH OFFICER OF
## MISSISSIPPI

No. 74–1148.   Argued December 1, 1975—Decided February 25, 1976

BRENNAN, J., delivered the opinion of the Court, in which all Members joined except STEVENS, J., who took no part in the consideration or decision of the case.

*Walter W. Christy* argued the cause for appellant. On the brief was *Samuel Lang.*

*Heber Ladner, Jr.,* argued the cause for appellee. With him on the brief was *A. F. Summer,* Attorney General of Mississippi, and *Hugo Newcomb,* Assistant Attorney General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Section 11 of Mississippi's Regulation Governing the Production and Sale of Milk and Milk Products in Mississippi, promulgated by the Mississippi State Board of Health (1967), provides, among other things, that "[m]ilk and milk products from . . . [another State] may be sold in . . . Mississippi . . . provided . . . that the regulatory agency [of the other State that] has jurisdiction accepts Grade A milk and milk products produced and processed in Mississippi on a reciprocal basis."[1]

---

[1] Section 11 provides in full text:

"Milk and milk products from points beyond the limits of routine inspection of the state of Mississippi or its police jurisdiction, may be sold in the state of Mississippi or its police jurisdiction, provided

The question presented by this case is whether Mississippi, consistently with the Commerce Clause, Art. I, § 8, cl. 3, of the Constitution,[2] may, pursuant to this regulation, constitutionally deny a Louisiana milk producer the right to sell in Mississippi milk satisfying Mississippi's health standards solely because the State of Louisiana has not signed a reciprocity agreement with the State of Mississippi as required by the regulation. A three-judge District Court in the Southern District of Mississippi rejected appellant's Commerce Clause challenge, holding that "[s]ection 11 is within the permissible limits of state police powers even though it incidentally or indirectly involves or burdens interstate commerce." 383 F. Supp. 569, 575 (1974). We noted probable jurisdiction of appellant's appeal, 421 U. S. 961 (1975). We reverse.[3]

## I

Appellant, The Great Atlantic & Pacific Tea Co., Inc. (A&P), a Maryland corporation, owns and operates 38 outlets in Mississippi that engage in the retail sale

they are produced, pasteurized, and labeled under regulations which are substantially equivalent to this Regulation and have been awarded an acceptable milk sanitation compliance rating of 90 percent or above made by a state milk sanitation rating officer certified by the U. S. Public Health Service, and Provided further, that the regulatory agency who [sic] has jurisdiction accepts Grade A milk and milk products produced and processed in Mississippi on a reciprocal basis. The health authority is authorized to require and conduct laboratory analysis and investigations to determine if the milk and milk products are in compliance with this Regulation." Record 102.

[2] The Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, provides: "The Congress shall have power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

[3] Appellant also alleged a claim for relief under the Equal Protection Clause of the Fourteenth Amendment. In view of our conclusion we have no occasion to address that claim.

of milk and milk products. A&P also operates at Kentwood, La., a plant for the processing of raw milk into milk and milk products for delivery to its retail outlets. A&P invested over $1 million in the Kentwood processing facilities, intending that part of the dairy products produced at the facility would supply its retail outlets in Mississippi. However, A&P's application on August 28, 1972, to the Mississippi State Board of Health for a permit to distribute the products from its Kentwood facility for sale in Mississippi was denied by the Board because A&P failed to submit the reciprocal agreement between Louisiana and Mississippi required by § 11.[4] Appellant thereupon brought this action.

Evidence was stipulated before the District Court which conclusively established that the milk produced at the Kentwood plant fully complied with the requirements of § 11 in all respects save the required reciprocity agreement. The Kentwood plant had received milk sanitation-compliance ratings in excess of 90% in all respects following each inspection by Louisiana officials. These sanitation-compliance ratings were published in the Sanitation Compliance and Enforcement Ratings of Interstate Milk Shippers, a list compiled by the Public Health Service and the Food and Drug Administration of the United States Department of Health, Education, and Welfare (HEW), which includes only processors receiving compliance ratings from state officials who have been certified by the Public Health Serv-

---

[4] A&P attempted but failed to obtain the required reciprocity agreement from the Louisiana health authorities. It was informed by Louisiana health officials that Louisiana had not entered into a reciprocity agreement with any State, that in the opinion of Louisiana officials processed milk from Mississippi did not meet Louisiana health standards, and that Mississippi-processed milk from plants that met Louisiana standards would be admitted for sale in Louisiana. Record 15.

ice. Further, the parties stipulated that the Supervisor of the Milk Control Program of the Mississippi State Board of Health testified, on the basis of an inspection by Louisiana officials of the Kentwood plant reported on an HEW form, that Kentwood milk would be acceptable in Mississippi as the Louisiana regulations were substantially equivalent to Mississippi's within the meaning of § 11. Thus only the lack of a reciprocity agreement between the two States prevented appellant from marketing its Kentwood milk at its Mississippi retail outlets.[5]

## II

Mississippi's answer to appellant's Commerce Clause challenge is that the reciprocity requirement of § 11 is a reasonable exercise of its police power over local affairs, designed to assure the distribution of healthful milk products to the people of its State. We begin our analysis by again emphasizing that "[t]he very purpose of the Commerce Clause was to create an area of free trade among the several States." *McLeod* v. *J. E. Dilworth Co.*, 322 U. S. 327, 330 (1944). And at least since *Cooley* v. *Board of Wardens*, 12 How. 299 (1852), it has been clear that "the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. . . . [T]he Commerce

---

[5] Appellee makes no contention that there are alternative means by which appellant's milk may be judged qualified under Mississippi standards and thereby admitted for sale in the State. Indeed, appellee states that without reciprocity, milk from the Kentwood plant must be subjected to on-site inspection according to Mississippi health standards, and that Mississippi currently makes no provision for out-of-state inspection by Mississippi officials. Brief for Appellee 15–16, n. 1.

Clause even without implementing legislation by Congress is a limitation upon the power of the States." *Freeman* v. *Hewit,* 329 U. S. 249, 252 (1946). It is no less true, of course, that under our constitutional scheme the States retain "broad power" to legislate protection for their citizens in matters of local concern such as public health, *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 531–532 (1949), and that not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States. *Freeman* v. *Hewit, supra,* at 253; *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346, 351–352 (1939). Rather, in areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause—where local and national powers are concurrent— the Court in the absence of congressional guidance is called upon to make "delicate adjustment of the conflicting state and federal claims," *H. P. Hood & Sons, Inc.* v. *Du Mond, supra,* at 553 (Black, J., dissenting), thereby attempting "the necessary accommodation between local needs and the overriding requirement of freedom for the national commerce." *Freeman* v. *Hewit, supra,* at 253. In undertaking this task the Court, if it finds that a challenged exercise of local power serves to further a legitimate local interest but simultaneously burdens interstate commerce, is confronted with a problem of balance:

> "Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly

excessive in relation to the putative local benefits. *Huron Cement Co.* v. *Detroit,* 362 U. S. 440, 443. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970).[6]

Adjudication of Commerce Clause challenges to the validity of local milk regulations burdening interstate milk is not a novel experience for this Court. See, *e. g., Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S. 361 (1964); *Dean Milk Co.* v. *Madison,* 340 U. S. 349 (1951); *H. P. Hood & Sons, Inc.* v. *Du Mond, supra; Milk Control Board* v. *Eisenberg Farm Products, supra; Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511 (1935).

The District Court seems to have concluded that *Dean Milk Co.* v. *Madison, supra,* while especially pertinent to a decision upon the validity of the reciprocity provision

---

[6] Adjudication entails "emphasis upon the concrete elements of the situation that concerns both state and national interests. The particularities of a local statute touch its special aims and the scope of their fulfillment, the difficulties which it seeks to adjust, the price at which it does so. . . . [P]ractical considerations, however screened by doctrine, underlie resolution of conflicts between state and national power." F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite 33–34 (1937).

"[I]t seems clear that those interferences [with interstate commerce] not deemed forbidden are to be sustained . . . because a consideration of all the facts and circumstances, such as the nature of the regulation, its function, the character of the business involved and the actual effect on the flow of commerce, lead to the conclusion that the regulation concerns interests peculiarly local and does not infringe the national interest in maintaining the freedom of commerce across state lines." *Di Santo* v. *Pennsylvania,* 273 U. S. 34, 44 (1927) (Stone, J., dissenting).

of § 11, did not require the conclusion that the requirement rendered the section violative of the Commerce Clause. We disagree. *Dean Milk* involved a Madison, Wis., ordinance that forbade the sale of milk in the city unless it had been pasteurized and bottled at an approved plant located within five miles of the center of the city. Although agreeing that sanitary regulation of milk originating in remote areas is a " 'matter . . . which may appropriately be regulated in the interest of the safety, health and well-being of local communities,' " 340 U. S., at 353, the Court held that the Madison ordinance could not withstand challenge under the Commerce Clause, "even in the exercise of [the city's] unquestioned power to protect the health and safety of its people, if reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are available." *Id.*, at 354. Inquiry whether adequate and less burdensome alternatives exist is, of course, important in discharge of the Court's task of "accommodation" of conflicting local and national interests, since any " 'realistic' judgment" whether a given state action "unreasonably" trespasses upon national interests must, of course, consider the "consequences to the state if its action were disallowed." Dowling, Interstate Commerce and State Power, 27 Va. L. Rev. 1, 22 (1940).

*Dean Milk* identified as adequate to serve local interests, and yet less burdensome to the flow of interstate commerce, the alternatives of either inspection of the distant plants by city officials, or reliance on milk ratings obtained by officials in localities having standards as high as those of Madison, the enforcement of which could be verified by reliance on the United States Public Health Service's system of checking local ratings. This latter alternative reflected the recommendation of the United States Public Health Service based on § 11 of the

Model Milk Ordinance proposed by the Service, *Dean Milk, supra,* at 355 n. 5, that the local "health officer approve milk or milk products from distant points without his inspection if they are produced and processed under regulations equivalent to those of this ordinance, and if the milk or milk products have been awarded by the State control agency a rating of 90 percent or more on the basis of the Public Health Service rating method." The Illinois producer's milk involved in *Dean Milk* was processed in plants inspected by the public health authorities in Chicago on the basis of the Public Health Service rating method.

The District Court in the instant case acknowledged that "[i]nterestingly enough Section 11 of the Mississippi regulation, but for the reciprocal clause, is identical in every material aspect to Section 11 of the U. S. Public Health Service Ordinance" discussed in *Dean Milk.* 383 F. Supp., at 574. Accordingly, the District Court concluded that § 11 was "free of any constitutional infirmity," "insofar as it follows Section 11 of the U. S. Public Health Service Milk Ordinance." *Id.,* at 575. The District Court held further that the reciprocity clause of Mississippi's § 11—not found in HEW's proposed Model Milk Ordinance § 11—did not constitute a sufficient burden on interstate commerce to violate the Commerce Clause. Mississippi, said the District Court, may constitutionally "enforce its own standards, either through inspections at the source of the processed milk, although such may require out-of-state inspections, or through reciprocal agreements . . ." and "[a]s long as Mississippi mutually exchanges standards of inspection with other states, there can be no burden on interstate trade." 383 F. Supp., at 575. Further, said the District Court, "Mississippi adopted the reciprocity clause to avoid the expense of out-of-state inspections,"

*id.,* at 576, and offers reciprocity to all States without discrimination.

The fallacy in the District Court's reasoning is that it attached insufficient significance to the interference effected by the clause upon the national interest in freedom for the national commerce, and attached too great significance to the state interests purported to be served by the clause. Although not in terms an absolute and universal bar to sales of out-of-state milk, which was the effect of the Madison ordinance invalidated in *Dean Milk,* the barrier of the reciprocity clause to sales of out-of-state milk in Mississippi has in this case also "in practical effect exclude[d] from distribution in [Mississippi] wholesome milk produced . . . in [Louisiana]." 340 U. S., at 354.[7] Only state interests of substantial importance can save § 11 in the face of that devastating effect upon the free flow of interstate milk.

Mississippi's contention that the reciprocity clause serves its vital interests in maintaining the State's health standards borders on the frivolous. The clause clearly does not do so in the sense of furthering Mississippi's established milk quality standards. For, according to appellee, "§ 11 covenants that Mississippi will do the inspections, will certify them, and will accept a standard below that applicable to domestic producers if the forwarding state will do the same." Brief for Appellee 9. Thus, even if Louisiana's standards were lower than Mississippi's, the clause permits Louisiana milk to be admitted to Mississippi if Louisiana enters into a reciprocity agreement. The reciprocity clause thus disserves rather than promotes any higher Mississippi milk quality stand-

---

[7] The parties stipulated in the District Court that the net annual cost to A&P incurred by its inability to use the product of its Kentwood facility and its consequent reliance on alternative sources of supply was $195,700.

ards. Therefore this is a case where the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.,* 397 U. S., at 142.

Mississippi next argues that the reciprocity clause somehow enables Mississippi to assure itself that the reciprocating State's (here Louisiana's) health standards are the "substantial equivalent" of Mississippi's.[8] But even if this were true, and the premise may be disputed,[9] there are means adequate to serve this interest

---

[8] "If Louisiana will not give trust and reliance to Mississippi's conduct of the inspections, then Mississippi is loath to accept the same Louisiana procedures, out of a regard for the health and welfare of her own citizens." Brief for Appellee 11.

[9] A sample reciprocity agreement acceptable to Mississippi is the following:

"AN ACCEPTABLE AGREEMENT TO MISSISSIPPI STATE BOARD OF HEALTH REGARDING RECIPROCITY IN THE MOVEMENT OF GRADE A MILK AND MILK PRODUCTS IN INTERSTATE SHIPMENT

"1. Each state shall be responsible for inspecting, sampling, and enforcing its regulations that apply to the dairies and milk plants located in its respective state, provided each state's regulation is substantially equivalent.

"2. The appropriate state regulatory agency shall certify to the receiving state agency that the dairies and plants involved in interstate shipment hold a valid Grade A permit from said agency.

"3. Milk and milk products received into each state shall meet the chemical and bacteriological standards, labeling and delivery vehicle requirements of the receiving state.

"4. Public health sanitation ratings shall be made by certified rating officials of the respective states of any milk supply involved in interstate shipment. The ratings shall be submitted to the FDA–PHS to be included and maintained on the Interstate Milk Shippers List and published by the FDA–PHS so that they can make spot check ratings of the supplies involved to determine if satisfactory

that are substantially less burdensome on commerce, and, therefore, *Dean Milk* teaches that the burden of the mandatory reciprocity clause cannot be justified in view of the character of the local interest and these available methods of protecting it. In the absence of adequate assurance that the standards of a sister State, either as constituted or as applied, are substantially equivalent to its own, Mississippi has the obvious alternative of applying its own standards of inspection to shipments of milk from a nonreciprocating State.[10] *Dean Milk,* 340 U. S., at 355, expressly supported the adequacy of this alternative: "[S]uch inspection is readily open to it without hardship for it could charge the actual and reasonable cost of such inspection to the importing producers and processors." [11] Cf. *Evansville-Vanderburgh Airport Au-*

---

sanitation surveillance is being carried out by the respective state. All sanitation ratings shall be 90% in compliance or above in order to be acceptable to the respective states.

"5. The regulatory agencies of each state shall sign reciprocity agreements containing the above stipulations."

[10] On this record, we are not presented with and need not decide the question of the constitutionality under the Commerce Clause of a State's insistence on reinspection of milk originating in a foreign State where that insistence is not prompted by a health-related need to assure adequate standards but rather is prompted solely as a retaliatory measure because the foreign State refuses to accept the receiving State's standards as adequate.

[11] Mississippi's regulations call for inspection of "each dairy farm, milk hauler, milk plant, receiving station, and transfer station whose milk or milk products are intended for consumption within the State of Mississippi" as a condition to the issuance of a permit, and for periodic inspection thereafter. Miss. Reg. § 5, Record 77. Although appellant's Kentwood plant is, of course, located outside Mississippi and would require out-of-state inspection by Mississippi officials, only six of 105 dairy farms from which A&P purchases raw milk are located outside Mississippi. Plaintiff's Exhibit 1, and Exhibit A.

Appellant represents that it has already offered to pay the

*thority District* v. *Delta Airlines, Inc.,* 405 U. S. 707 (1972).

### III

Mississippi argues that apart from the putative health-related interests served by the clause, the reciprocity requirement is in effect a free-trade provision, advancing the identical national interest that is served by the Commerce Clause.

The argument is two-pronged. First, Mississippi argues that the reciprocity requirement serves to help eliminate "hypertechnical" inspection standards that vary between different States.[12] Such hypertechnical standards are said to burden commerce by requiring costly duplicative or out-of-state inspection in instances where, for truly health-related purposes, the standards of the different States are "substantially equivalent." The Court has recognized that mutually beneficial objectives may be promoted by voluntary reciprocity agreements, and that the existence of such an agreement between two or more States is not a *per se* violation of the Commerce Clause of which citizens of nonreciprocating States who do not receive the benefits conferred by the agreement may complain. See *Kane* v. *New Jersey,* 242 U. S. 160, 167–168 (1916); cf. *Bode* v. *Barrett,* 344 U. S. 583

---

reasonable expenses of required out-of-state inspection, Brief for Appellant 7, although evidence of that offer does not appear in the record.

[12] "[W]e say this regulation is wiser and more productive for interstate commerce through all the States than having these picayune problems of how many square feet of floor space is in the milk parlor, or what the temperature of the milk is when it goes to the cooling truck." Tr. of Oral Arg. 20.

A&P agrees that reciprocity among States is a "laudable goal. Reciprocity, by eliminating hyper-technical standards peculiar to one state, may aid the free flow of milk." Jurisdictional Statement 9.

(1953).[13]  But we have not held that acceptance of offered reciprocity is required from other States, see *Kane* v. *New Jersey, supra,* at 168, or that a State may threaten complete isolation as the alternative to acceptance of its offer of reciprocity.  Mississippi may offer reciprocity to States with substantially equivalent health standards, and insist on enforcement of its own, somewhat different, standards as the alternative.  But Mississippi may not use the threat of economic isolation as a weapon to force sister States to enter into even a desirable reciprocity agreement.

The second prong of appellee's argument that the reciprocity requirement promotes trade between the States draws upon Mississippi's allegations that Louisiana is itself violating the Commerce Clause by refusing to admit milk produced in Mississippi.  Mississippi asserts that Louisiana has refused reciprocity with Mississippi in bad faith, and in fact has erected economic barriers to the sale of Mississippi milk in Louisiana under the guise of health and inspection regulations.  Hence, the reciprocity agreement, it is argued, is a legitimate means by which Mississippi may seek to gain access to Louisiana markets for its own producers as a condition to allowing Louisiana milk to be sold in Mississippi.  We cannot agree.

First, to the extent, if any, that Louisiana is unconstitutionally burdening the flow of milk in interstate commerce by erecting and enforcing economic trade barriers

---

[13] We are not called upon to decide in this case whether or at what point the diversionary effects upon trade occasioned by a given reciprocity agreement (even though voluntary and non-discriminatory) between some but not all States might be such as to constitute an impermissible burdening of the national interests embodied in the Commerce Clause, or the Compact Clause.  Cf. *Bode* v. *Barrett,* 344 U. S., at 586; *Wharton* v. *Wise,* 153 U. S. 155, 171 (1894).

to protect its own producers from competition under the guise of health regulations, the Commerce Clause itself creates the necessary reciprocity: Mississippi and its producers may pursue their constitutional remedy by suit in state or federal court challenging Louisiana's actions as violative of the Commerce Clause.

Second, to the extent that Louisiana is legitimately exercising its local powers in the interest of the health of its citizens by refusing reciprocity and consequently the admission of milk deemed in good faith by state officials to be of insufficient quality, Mississippi is not privileged under the Commerce Clause to force its own judgments as to an adequate level of milk sanitation on Louisiana at the pain of an absolute ban on the interstate flow of commerce in milk. However available such methods in an international system of trade between wholly sovereign nation states, they may not constitutionally be employed by the States that constitute the common market created by the Framers of the Constitution. To allow Mississippi to insist that a sister State either sign a reciprocal agreement acceptable to Mississippi or else be absolutely foreclosed from exporting its products to Mississippi would plainly "invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause." *Dean Milk,* 340 U. S., at 356. No "parochial legislative polic[y]," *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 538, could be more precisely calculated to open "the door . . . to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S., at 522.

> "The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and

that in the long run prosperity and salvation are in union and not division." *Id.*, at 523.

The mandatory reciprocity provision of § 11, insofar as justified by the State as an economic measure, is "precisely the kind of hindrance to the introduction of milk from other States . . . condemned as an 'unreasonable clog upon the mobility of commerce. . . . [It is] hostile in conception as well as burdensome in result.' " *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S., at 377.

Accordingly, we hold that the mandatory character of the reciprocity requirement of § 11 unduly burdens the free flow of interstate commerce and cannot be justified as a permissible exercise of any state power. The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

<em>It is so ordered.</em>

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.