BT INVESTMENT MANAGERS, INC.
and Bankers Trust New York
Corporation, Plaintiffs,

v.

Gerald A. LEWIS, Comptroller of the State of Florida and Commissioner of Banking of the State of Florida, Defendant.

TCA 73–184.

United States District Court,
N. D. Florida,
Tallahassee Division.

Dec. 15, 1978.

John E. Mathews, Jr. and Stephen E. Day, Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, Fla., for plaintiffs.

Franklyn J. Wollett, Asst. Gen. Counsel, Tallahassee, Fla., for defendant.

J. Thomas Cardwell, Akerman, Senterfitt & Eidson, Orlando, Fla., for amicus curiae.

Before RONEY, Circuit Judge, ARNOW, Chief District Judge, and STAFFORD, District Judge.

## OPINION

STAFFORD, District Judge.

Plaintiffs Bankers Trust New York Corporation (BTNYC) and BT Investment Managers (BTIM) have brought this action seeking a declaration that Florida Statutes § 660.10 and a portion of Florida Statutes § 659.141(1) contravene the United States Constitution and for an injunction restraining their enforcement. Jurisdiction, which is not contested, is founded upon 28 U.S.C. §§ 1331 and 1343(3). This three-judge district court was convened pursuant to 28 U.S.C. § 2281.[1]

The case was submitted to the court upon a stipulation of facts by the parties, and a final hearing was conducted on September 1, 1978. Upon consideration of the matters presented to the court, we hold that the challenged portion of Florida Statutes § 659.141(1), which prohibits a bank, trust company, or holding company that principally conducts its business outside the State of Florida from owning or controlling a business organization in this state which furnishes investment advisory services, violates the commerce clause, Article I, § 8, of the Constitution.[2] Similarly, we hold invalid under the commerce clause Florida Statutes § 660.10, which bars all corporations except banks and trust companies incorporated in Florida and national banks located in Florida from exercising various trust powers and duties in this state.[3] Since the determination that the

---

1. This action was filed on October 24, 1973, and thus the propriety of empanelling a three-judge court was unaffected by the repeal of 28 U.S.C. § 2281 in 1976. Pub.L. 94–381, Aug. 12, 1976, 90 Stat. 1119.

2. The pertinent portion of Florida Statutes § 659.141(1) provides:

 (1) Except as provided in subsection (3) of this section, no bank, trust company, or holding company, the operations of which are principally conducted outside this state, shall acquire, retain, or own, directly or indirectly, all or substantially all the assets of, or control over, any bank or trust company having a place of business in this state where the business of banking or trust business or functions are conducted, or acquire, retain, or own all or substantially all of the assets of, or control over, any business organization having a place of business in this state where or from which it furnishes investment advisory services in this state.

3. Florida Statutes § 660.10 provides:

 All corporations except banks and trust companies incorporated under the laws of this state and having trust powers and except national banking associations located in this state and having trust powers, are prohibited from exercising any of the powers or duties and from acting in any of the capacities, within this state, as follows:

 (1) As executor or administrator of the estate of any decedent, whether such decedent was a resident of this state or not, and whether the administration of the estate of such decedent be original or ancillary; provided, that if the executor or administrator of the estate of a nonresident decedent be a corporation duly authorized, qualified and acting as such executor or administrator in the jurisdiction of the domicile of the decedent, it may, as a foreign executor or administrator perform such duties and exercise such powers and privileges as are required, authorized or permitted by s. 734.30.

 (2) As guardian of any infant, insane person or person physically or mentally incompetent whether domiciled in this state or not.

 (3) As trustee under any will or other testamentary instrument, provided any corporation that is authorized to act as trustee under the laws of the place where it has its principal place of business may receive bequests as trustee of money or intangible personal property and devises of real property located in Florida and may sell, transfer and convey the property.

 (4) As trustee of any real estate in this state or any interest therein under any agreement whereby the beneficial interest in such property is vested in others.

 (5) As trustee under any deed of trust or other instrument executed after June 10,

subject statutes offend the commerce clause is sufficient to dispose of the controversy between the parties, we express no opinion as to the validity or invalidity of the statutes under any other constitutional theory proffered by plaintiffs.[4]

BTNYC is a corporation organized under the laws of New York and is a "bank holding company" within the meaning of the Bank Holding Company Act, 12 U.S.C. § 1841, et seq. BTIM is a corporation organized under the laws of Delaware, and is a wholly-owned subsidiary of BTNYC. BTIM qualified to do business in Florida on November 27, 1972, and plans to locate an office in the city of Palm Beach, Florida.

Defendant Gerald A. Lewis is the incumbent Comptroller and Commissioner of Banking of the State of Florida. The Florida Bankers Association (FBA or amicus) has been granted leave to appear in this action as amicus curiae to argue, along with defendant, in favor of the validity of the challenged statutes.

The factual history of this litigation opens with the 1970 amendments to the Bank Holding Company Act, and specifical-

---

1937, conveying or encumbering any real or tangible personal property in this state given to secure bonds or other evidence of indebtedness unless in such deed of trust or other instrument a trust company or bank having trust powers and located in this state or an individual residing in this state shall be named as cotrustee; and no suit shall be brought to foreclose any such deed of trust or other instrument unless such cotrustee or successor cotrustees of like qualifications be a party plaintiff.

(6) As receiver or trustee under appointment of any court in this state.

(7) As assignee, receiver or trustee of any insolvent person or corporation or under any assignment for the benefit of creditors.

(8) As fiscal agent, transfer agent or registrar of any municipal or private corporation, provided that this prohibition shall not be so construed as to prevent banks and trust companies not located in this state from acting within the state where located as fiscal agent, transfer agent or registrar of municipal or private corporations of this state; provided further, however, that nothing herein shall prevent any Florida corporation not a bank or trust company and not having trust powers from being its own fiscal agent, transfer agent or registrar concerning its own affairs, stock or securities. Provided, however, that nothing in this section or in any other law of this state shall be construed to prohibit a foreign bank or foreign trust company as trustee of any charitable foundation or endowment, employees' pension, retirement or profit-sharing trust, alone or together with a cotrustee from: Contracting in this state or elsewhere with any person to acquire from such person a part or the entire interest in a loan which such person proposes to make, has heretofore made or hereafter makes, together with a like interest in any security instrument covering real or personal property in the state proposed to be given or hereafter or heretofore given to such person to secure or evidence such loan; servicing directly or entering into servicing contracts

with persons, and enforcing in this state the obligations heretofore or hereafter acquired by it in the transaction of business outside of this state or in the transaction of any business authorized or permitted hereby; or acquiring, holding, leasing, mortgaging, contracting with respect to, or otherwise, protecting, managing, or conveying property in this state which has heretofore or may hereafter be assigned, transferred, mortgaged or conveyed to it as security for, or in whole or in part satisfaction of, a loan or loans made by it or obligations acquired by it in the transaction of any business authorized or permitted hereby; provided, further, that no such foreign bank or trust company shall be deemed to be transacting business in this state, or be required to qualify so to do, or to be unlawfully exercising powers or duties or acting in an unlawful or prohibited capacity or to be violating any of the provisions of this section or of any other law of this state, solely by reason of the performance of any of the acts of business hereinbefore permitted or authorized hereby; and provided, further, that nothing herein shall be construed as authorizing or permitting any foreign bank or trust company to maintain an office within this state.

It should be noted that both Florida Statutes § 660.10 and Florida Statutes § 659.141 are affected by the Florida Regulatory Reform Act of 1976, Florida Laws 1976, ch. 760178, Florida Statutes § 11.61, and are slated to be repealed effective July 1, 1980, unless the Legislature decides prior to January 1, 1980 to retain them.

4. In addition to the commerce clause the complaint alleges three other constitutional grounds upon which the statutes are said to be invalid: (1) denial of equal protection; (2) denial of substantive due process; and (3) violation of the supremacy clause, Article VI, clause 2. Plaintiffs abandoned reliance on the last two of these contentions prior to the final hearing in this case.

ly the amendment to § 4(c)(8) of the Act, 12 U.S.C. § 1843(c)(8). Prior to 1970 § 4(c)(8) provided that a bank holding company could not acquire ownership or control of any company which is not a bank or bank holding company, except for "any company *all the activities of which are . . . of a financial, fiduciary, or insurance nature* and which the Board [of Governors of the Federal Reserve System] . . . by order has determined to be so closely related to the business of banking or of managing or controlling banks as to be a proper incident thereto . . . ." (emphasis added).

The 1970 amendment to this provision, P.L. 91–607, Title I, § 103(4), 84 Stat. 1763, significantly expanded the statutory definition of activities deemed to be "so closely related to banking . . . as to be a proper incident thereto." Deleted from the statutory language was the former limitation to activities of a "financial, fiduciary, or insurance nature." Following the amendment bank holding companies were authorized to own or control

> any company the activities of which the Board . . . has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular ac-

tivity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices. In orders and regulations under this subsection, the Board may differentiate between activities commenced *de novo* and activities commenced by the acquisition, in whole or in part, of a going concern.

12 U.S.C. § 1843(c)(8).

The statute grants the Board of Governors of the Federal Reserve System authority to adopt regulations more specifically defining those business activities "so closely related to banking . . . as to be a proper incident thereto." The Board has determined that [p]erforming or carrying on any one or more of the functions or activities that may be performed or carried on by a trust company" and "[a]cting as investment or financial advisor" are such activities. 12 C.F.R. § 225.4(a)(4) & (5).[5]

---

**5.** 12 C.F.R. § 225.4(a)(4) & (5) provides in relevant part:

> (a) . . . The following activities have been determined by the Board to be so closely related to banking or managing or controlling banks as to be a proper incident thereto:
>
> . . .
>
> (4) Performing or carrying on any one or more of the functions or activities that may be performed or carried on by a trust company (including activities of a fiduciary, agency, or custodian nature), in the manner authorized by Federal or State law, so long as the institution does not make loans or investments or accept deposits other than (i) deposits that are generated from trust funds not currently invested and are properly secured to the extent required by law, or (ii) deposits representing funds received for a special use in the capacity of managing agent or custodian for an owner of, or investor in, real property, securities, or other personal property, or for such owner or investor as agent or custodian of funds held for investment or escrow agent, or for an issuer of, or broker or dealer in securities, in a capacity

> such as paying agent, dividend disbursing agent, or securities clearing agent, and not employed by or for the account of the customer in the manner of a general purpose checking account or bearing interest, or (iii) making of call loans to securities dealers or purchase of money market instruments such as certificates of deposit, commercial paper, government or municipal securities, and bankers acceptances (such authorized loans and investments, however, may not be used as a method of channeling funds to nonbanking affiliates of the trust company);
>
> (5) Acting as investment or financial adviser to the extent of (i) serving as the advisory company for a mortgage or a real estate investment trust; (ii) serving as investment adviser, as defined in section 2(a)(20) of the Investment Company Act of 1940, to an investment company registered under that Act; (iii) providing portfolio investment advice to any other person; (iv) furnishing general economic information and advice, general economic statistical forecasting services and industry studies, and (v) providing financial advice to State and local governments, such

Acting on the basis of the post-1970 federal bank holding company statutes and regulations, BTNYC applied to the Board of Governors of the Federal Reserve System on October 3, 1972, for authority indirectly to engage *de novo* in the performance of investment advisory services through its subsidiary BTIM, at an office to be located in Palm Beach, Florida.

While the application was pending, the Florida Legislature, convened in special session for the purpose of considering matters unrelated to this lawsuit, also passed a bill amending Florida Statutes § 659.141(1) in such a manner as to remove BTNYC's right under state law to engage in the investment advisory business in Florida. Laws of Florida 1972, ch. 72–726. It is apparent that the bill was hurriedly enacted at the instance of the FBA and defendant's predecessor in office in response to BTNYC's application; the Board so found,[6] and defendant and the FBA have offered no evidence to the contrary.

Until passage of the amendment to § 659.141(1), that statute forbade any "bank, trust company or holding company, the operations of which are principally conducted outside [Florida]" from acquiring control over "any business organization having a place of business in [Florida] where or from which it furnishes investment advisory services *to trust companies or banks* in [Florida]" (emphasis added). The amended statute eliminated all reference to trust companies or banks, thereby extending the prohibition on the furnishing of investment advice to the giving of advice to *any* person from a place of business located in this state.

On April 26, 1973, the Board issued an order rejecting BTNYC's application. The Board's reasoning bears partial recitation here:

Absent the recent enactment of amendments to section 659.141 and any evidence indicating that *de novo* entry in this case would have the purpose or effect of foreclosing future competition or would oth-

erwise be contrary to the public interest, it appears likely that the Board would have approved the instant proposal. The Board recognizes, as has Congress, "that an activity commenced *de novo* will tend to have pro-competitive effects, and consequently should be viewed more favorably than the commencement of an activity through the acquisition of an existing concern" and "where a bank holding company enters a new market *de novo* . . . , its desire to succeed in its new endeavor is more likely to be competitive". However, while the instant proposal was pending before the Board, the Florida Statutes were amended to generally prohibit the provision of investment advisory services in Florida by non-Florida-based bank holding companies through control of business organizations having offices in Florida.

Federal Reserve Board Order of April 26, 1973, 59 Fed.Res.Bull. 364, 365 (1973). Under the authority of *Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), and § 7 of the Bank Holding Company Act, 12 U.S.C. § 1846, the Board concluded that it was required to deny BTNYC's proposal on the ground that it was prohibited by state law.

Subsequent to the Board's order plaintiffs filed this lawsuit. Count I of the complaint asks for declaratory and injunctive relief against the operation of § 659.-141(1). Count II seeks identical relief against the joint operation of §§ 659.141(1) and 660.10, which together prevent BTNYC from operating a subsidiary trust company in the State of Florida. Concerning Count II, the complaint alleges, and the parties to this lawsuit have stipulated, that,

But for the existence of the challenged statutes, Bankers Trust New York Corporation would have applied to the Board of Governors of the Federal Reserve System, pursuant to 12 U.S.C. § 1843(c)(8) and 12 C.F.R. § 225.4(b)(1), for authority to engage, through a subsidiary trust

---

as with respect to the issuance of their securities.

**6.** *See* Federal Reserve Board Order of April 26, 1973, 59 Fed.Res.Bull. 364, 366 (1973).

company having a national bank charter or a Florida state charter, in the activity of performing or carrying on at a place of business in Florida one or more of the functions or activities that may be performed or carried on by a trust company in the manner authorized by Florida law but without the power to accept demand deposits or make commercial loans; and would have *organized such a trust compa-ny* under the laws of the United States or the State of Florida.

Stipulation filed May 11, 1978, at 2–3. The parties have further stipulated that the "enforcement, or threatened enforcement" of §§ 659.141(1) and 660.10" has caused [BTIM and BTNYC] injury, loss of potential profits and loss of opportunity for corporate gain." *Id.* at 3.

■■■■ Turning to the merits of the present controversy, it is necessary initially to dispose of the threshold question whether the business activities prohibited by §§ 659.-141(1) and 660.10 constitute interstate commerce. Defendant insists that since the challenged statutes merely forbid foreign corporations from doing business *in this state,* only *intra*-state commerce is affected.[7] This claim is unconvincing. While the phrase "interstate commerce" does not "comprehend that commerce, which is completely internal, . . . and which does not extend to or affect other states," *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 194, 6 L.Ed. 23 (1824), the notion of what is "completely internal" traditionally has been strictly and narrowly confined. For a business activity to come within the scope of the commerce clause, it need only have a substantial effect on interstate commerce. *See Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). As long as such an effect on interstate commerce is shown to exist, it is immaterial whether the activity in question is itself either wholly or primarily intrastate in nature.

The necessary effect on interstate commerce has been demonstrated here even though no direct evidence to prove such an effect has been presented.[8] This conclusion is compelled, first, because of the pervasive range of federal regulation of bank holding companies and their subsidiaries through the powers vested in the federal government under the commerce clause. This extensive regulation must constitutionally be founded upon a nexus between the provision of financial services and commerce between the states. No party to this case has contended that the connection to interstate commerce of the activities involved here is so insubstantial as to rob Congress of its authority to regulate in this field.[9]

Second, the complaint alleges, and plaintiffs have contended throughout the instant proceedings, that they desire to engage in interstate commerce and that the very nature of the business they seek to conduct in Florida would necessarily implicate a substantial volume of interstate trade and communications. The typical clients plaintiffs intend to serve in the Palm Beach office of

---

7. The FBA does not join in this contention, and its memoranda of law appear to concede that matters involving interstate commerce are at issue in this litigation.

8. The absence of direct evidence is attributable to the fact that the challenged statutes forbid plaintiffs from engaging in business, and thus there is no factual background to demonstrate what the actual effect of plaintiffs' proposed activities on interstate commerce would be.

9. *Katzenbach v. Morgan, Wickard v. Filburn,* and most other cases which hold that a business activity need only have a "substantial effect" on interstate commerce in order to come within the parameters of the commerce clause have dealt with the permissible extent of feder-al regulation. It might be questioned whether the commerce clause ought to be accorded a more confined scope where the issue at hand is whether to restrict or forbid state regulation of the incidents of commerce, thus allowing the states greater legislative leeway. The Supreme Court, in *Philadelphia v. New Jersey,* 437 U.S. 617, 622, 98 S.Ct. 2531, 2534–35, 57 L. Ed.2d 475, 480–81 (1978), specifically rejected this "two-tiered definition" of commerce. The court there concluded that the states are subject to "constitutional scrutiny" whenever they attempt to enter any regulatory field in which Congress has power to regulate under the commerce clause. *Id.* at 622, 98 S.Ct. at 2535, 57 L.Ed.2d at 481.

BTIM are persons vacationing in Florida who during the bulk of the year rely on BTNYC to handle their investment portfolios and who would likely wish to obtain investment advice during vacation from a Florida office of the same company. These, of course, are people who have crossed state lines in order to reach Florida. Even more significantly, the investment services rendered by plaintiffs would in the due course of business affect the stocks and securities of numerous corporations. The continual use of interstate and international mail, telephone, and wire communications would also be a necessary part of plaintiffs' business. Taken together, these probable incidents of plaintiffs' proposed activities more than demonstrate that interstate, as well as intrastate, commerce would be affected.

The essential disputes between the parties as to the commerce clause issue are as follows. Plaintiffs charge that §§ 659.-141(1) and 660.10 are blatantly undisguised protectionist measures designed to shield Florida banking, trust and investment advisory firms from free competition with foreign businesses. Consequently, plaintiffs assert, the statutes discriminate against and unduly burden interstate commerce in violation of the commerce clause.

Defendant and the FBA deny this claim and insist that §§ 659.141(1) and 660.10 serve significant and legitimate local interests justifying any possible burden upon interstate commerce. Furthermore, defendant and the FBA place great reliance on certain provisions of the Bank Holding Company Act which are claimed to affirmatively approve state prohibitions upon the entry into local markets of foreign bank holding companies and their subsidiaries.

The general constitutional principles governing a claim of interference with interstate commerce are well established. Although the commerce clause grants Congress the authority "[t]o regulate Commerce . . . among the several States," it has long been understood that, in the absence of conflicting federal legislation on a subject of potential regulation, the states retain a "residuum of power" to adopt their own regulations concerning that subject. *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945). *See also Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). That power, however, must be exercised within the restraints imposed by the commerce clause, *Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475, 481 (1978); *Raymond Motor Transportation v. Rice,* 434 U.S. 429, 439, 98 S.Ct. 787, 793, 54 L.Ed.2d 664, 674 (1978), and must not be used to create barriers to the free passage of interstate commerce, *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851); *Raymond Motor Transportation, supra.* Thus, "in areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause—where local and national powers are concurrent—the [federal courts] in absence of congressional guidance [are] called upon to make 'delicate adjustment of the conflicting state and federal claims' *H. P. Hood & Sons v. Du Mond,* 336 U.S. 525, 553, 69 S.Ct. 657, 93 L.Ed. 865 (Black, J., dissenting)." *A & P Tea Co. v. Cottrell,* 424 U.S. 366, 371, 96 S.Ct. 923, 929, 47 L.Ed.2d 55 (1976).

The guiding principles for effecting the necessary accommodation or balancing between competing national and state interests in light of the purposes of the commerce clause are best stated as follows:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 4 L.Ed.2d 852, 78 A.L.R.2d 1294. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). *See also Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976); *A & P Tea Co. v. Cottrell, supra.*

■ An entirely dissimilar set of considerations come into play, however, where it appears a state statute is no more than discriminatory protectionist legislation designed to promote local business to the exclusion of interstate competition and commerce. As to regulations of this nature, the Supreme Court has flatly stated that "where simple economic protectionism is effected by state legislation, *a virtually per se rule of invalidity* has been erected." *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475, 481 (1978) (emphasis added), citing *Hood & Sons v. Du Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); *Baldwin v. G. A. F. Seelig,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935); *Buck v. Kuykendall,* 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925). This inflexible rule is applied in order to make meaningful the constitutional concept of the United States as an economic whole, rather than a feuding collection of economically Balkanized states. As expressed in *Hood & Sons v. Du Mond, supra:*

> This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. As the Court said in *Baldwin v. Seelig,* 294 U.S. 511, 527, 55 S.Ct. 497, 79 L.Ed. 1032, "what is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation."

336 U.S. at 537–38, 69 S.Ct. at 665. Accordingly, the chief inquiry in the instant case is whether §§ 659.141(1) and 660.10 are "basically . . . protectionist measure[s], or whether [they] can fairly be viewed as law[s] directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2536, 57 L.Ed.2d at 482.

The record here, though sparse, is sufficient to indicate conclusively the discriminatory nature of the statutes under attack. By its terms Section 659.141(1) erects an insuperable barrier to the entry of foreign-based bank holding companies, through their subsidiaries, into the Florida investment advisory market. Section 660.10 similarly cordons off Florida trust companies from competition by out-of-state concerns. Thus, according to *Philadelphia v. New Jersey, supra,* this parochial legislation must be deemed per se unconstitutional.

■ Defendant and the FBA argue strenuously, however, that the statutes are justified by an overriding legislative purpose of furthering competition by preventing economically powerful out-of-state banking interests from gaining a stranglehold on the Florida market. The FBA, for example, contends the Florida Legislature, in amending § 659.141(1), "took action designed to attain the legitimate goal of protecting the public from the threat posed by the accumulation and concentration of economic power." Reply Memorandum of Law of Amicus Curiae, at 10. Doubtlessly, regulatory statutes seeking to curb anticompetitive abuses are within the proper exercise of the general police powers of the State of Florida. We cannot agree, however, that the mere invocation of this legitimate interest, without more, is sufficient to save discriminatory legislation of the type we deal with here.[10]

---

10. Where a state statute is challenged as violative of the commerce clause, a federal court is not permitted merely to assume that the statute serves an asserted state interest, as may be done when the court is confronted with an equal protection challenge to state regulation, *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). "The principle that, without controlling Congressional action, a state may not regulate interstate commerce so as substantially to affect its flow or deprive it of needed uniformity in its regulation is not to be avoided by 'simply invoking the convenient apologetics of the police power.'

■ Contentions based upon the legislative purpose motivating passage of the statutes must fail primarily because they are irrelevant once the discriminatory character of a state regulation is established. In *Philadelphia v. New Jersey, supra,* Mr. Justice Stewart recited the principle that

[T]he evil of protectionism can reside in legislative means as well as legislative ends. Thus, it does not matter whether the ultimate aim of ch. 363 is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect, ch. 363 violates this principle of nondiscrimination.

The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous competition . . . or to create jobs by keeping industry within the State, . . . or to preserve the State's financial resources from depletion by fencing out indigent immigrants. . . . In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy.

437 U.S. at 625, 98 S.Ct. at 2537, 57 L.Ed.2d at 483–84 (citations omitted).

*Kansas City Southern R. Co. v. Kaw Valley District,* 233 U.S. 75, 79, 34 S.Ct. 564, 58 L.Ed. 857; *Buck v. Kuykendall,* 267 U.S. 307, 315, 45 S.Ct. 324, 69 L.Ed. 623." *Southern Pacific Co.*

Here, it is amply evident that, even if the motive of the Florida Legislature was to promote competition in this state in the affected businesses, the means chosen for doing so are impermissible. There is no evidence to suggest that foreign banks and bank holding companies or companies which principally conduct their business outside the state constitute any more of a threat to free competition in Florida than firms located in this state. The available evidence, in fact, is directly to the contrary, at least as far as § 659.141(1) is concerned. The Board of Governors of the Federal Reserve System determined that, if it were not for the amendment of § 659.141(1), BTNYC's application to engage in the investment advisory business through its subsidiary BTIM would have been approved. By law, this determination may only have been made upon a finding by the Board that the business activity sought to be performed by plaintiffs could "reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices." 12 U.S.C. § 1843(c)(8). The Board specifically found there was no evidence plaintiffs' entry into the investment advisory field would harm competition and concluded that plaintiffs' proposed business would tend to have procompetitive effects. 59 Fed.Res.Bull. at 365.

■ Florida unquestionably may act by legislation to control or prevent undue concentrations of economic power in the banking, investment and trust businesses. In order not to run afoul of the commerce clause, though, this legislation must impact evenhandedly upon in-state and out-of-state firms alike. Sections 659.141(1) and 660.10 place the full weight of the purported state concern for competition upon foreign companies, leaving unchecked any possible abu-

*v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). *See also Raymond Motor Transportation v. Rice,* 434 U.S. 429, 441–45, 98 S.Ct. 787, 794–96, 54 L.Ed.2d 664, 675–78 (1978).

ses by Florida companies. Where, as here, there is no evidence beyond simple speculation that foreign companies pose any greater danger to competition than do Florida firms, the former may not be singled out for prohibition. Defendant and the FBA have not attempted to demonstrate that nondiscriminatory alternatives to the statutes challenged here would be unavailable or ineffective, *A & P Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976); *Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); indeed, the State of Florida possesses broad authority under its police powers to regulate the business activities of both Florida and non-Florida companies in this state to ensure that competition is fostered.

Moreover, the record is replete with indications that the legislative intent behind § 659.141(1), if not § 660.10, was to discriminate against interstate commerce. While no official record of legislative history or statement of legislative purpose accompanied the passage of either statute, the order of the Board of Governors of the Federal Reserve System in this case recounts the telling circumstances under which the bill amending § 659.141(1) was passed. The Board stated, "There appears to be tacit agreement that the recently-enacted legislation was intended to, and does, prohibit the performance of investment advisory services in Florida by non-Florida bank holding companies." 59 Fed.Res.Bull at 365.[11] The Board further determined that, "It is beyond question, and BTNYC and the protestants are in agreement, that the notice that BTNYC published in September, 1972, triggered the action of the Florida legislature in this case and that the newly-enacted legislation was primarily motivated by the threat of BTNYC's entry into the Florida investment advisory markets and was intended to prevent such entry." 59 Fed.Res.Bull. at 366.

The Board also found that the legislation had been passed at the urging of the FBA

and defendant's predecessor in office, a highly significant circumstance in determining whether discrimination against interstate commerce exists. As expressed in *Hunt v. Washington State Apple Advertising Comm'n, supra:*

> Despite the statute's facial neutrality, the Commission suggests that its discriminatory impact on interstate commerce was not an unintended byproduct and there are some indications in the record to that effect. The most glaring is the response of the North Carolina Agriculture Commissioner to the Commission's request for an exemption following the statute's passage in which he indicated that before he could support such an exemption he would "want to have the sentiment from our apple producers *since they were mainly responsible for this legislation being passed* . . . ."

432 U.S. at 352, 97 S.Ct. at 2446 (emphasis added).

 The final argument interposed by defendant and the FBA in favor of the validity of §§ 659.141(1) and 660.10 is that Congress, through certain provisions of the Bank Holding Company Act, 12 U.S.C. § 1841 et seq., has affirmatively consented to Florida's prohibition on the entry of foreign bank holding companies and their subsidiaries into this state. It has long been held that Congress, under its powers over interstate commerce, may legitimately approve regulations by the states that would otherwise violate the commerce clause. *See, e. g., Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). Defendant and the FBA specifically rely here upon 12 U.S.C. §§ 1842(d) and 1846 as constituting congressional authority for the discriminations against interstate commerce effected by the state laws being challenged.

Of the two federal statutes, § 1846 is the more easily disposed of. It provides:

---

11. In its opinion in this case the Fifth Circuit Court of Appeals was even more blunt in its appraisal of the purpose and effect of Florida Statutes § 659.141(1), terming it "a brazen attempt to prevent out-of-state competition." *BT Investment Managers, Inc. v. Lewis,* 559 F.2d 950, 954 n. 13 (1977).

The enactment by the Congress of the Bank Holding Company Act of 1956 shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to banks, bank holding companies, and subsidiaries thereof.

This language accomplishes nothing more than to assure that the states will not be deemed dispossessed of whatever regulatory authority they exercised over banks and bank holding companies prior to passage of the Bank Holding Company Act. In no wise does it pass on to the states the power to adopt regulations on any subject which would otherwise be contrary to the commerce clause. The remarks of the Fifth Circuit in the recent case of *Great Western United Corp. v. Kidwell*, 577 F.2d 1256 (5th Cir. 1978), are both instructive and dispositive:

When Congress has exempted state laws from commerce clause restrictions it has used language specifically directing that certain interstate commerce may be regulated as though it were purely local. See, e. g., the Wilson Act of 1890, 26 Stat. 313. Congress had also stated that, in the absence of affirmative Congressional action, courts should impose no barriers on state regulation. See the McCarran-Ferguson Act, 59 Stat. 33, 15 U.S.C. § 1011 et seq. The language in § 28 of the 1934 Act is notably different from these acknowledged examples of Congressional consent. Rather than allowing violations of the commerce clause, § 28 appears to direct only that federal securities law should not be interpreted as a wholesale displacement of state securities regulation.

*Id.* at 1281. Similarly, 12 U.S.C. § 1846 does not explicitly speak to exempting state banking and bank holding company regulations from the limitations of the commerce clause, and no such exemption should be read into the statute by this court.

▉ Section 1842(d) of Title 12 is of no greater avail to defendant and amicus than is § 1846. That section reads:

(d) Limitation by State boundaries. Notwithstanding any other provision of this section, no application shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later, unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest.

By its terms § 1842(d) prohibits a bank holding company from acquiring an additional *bank* in any state in which the business of its subsidiaries is not principally conducted. It does not specifically consent to any state's attempt to bar out-of-state bank holding companies from acquiring other companies within that state which are engaged in activities "so closely related to banking or managing or controlling banks as to be a proper incident thereto," within the meaning of 12 U.S.C. § 1843(c)(8).

Defendant and amicus argue, however, that the ability to prohibit the acquisition of banks within a particular state must necessarily carry with it the ability to prohibit the acquisition of companies involved in closely related activities. Otherwise, they claim, a "loophole" would be created allowing bank holding companies to expand their operations into non-consenting states despite the congressional mandate giving the states power to exclude them. Defendant and the FBA draw support from the original congressional purpose behind enactment of the Bank Holding Company Act in 1956, that being to limit the concentration

of economic power in the hands of bank holding companies. *See Alabama Ass'n of Insurance Agents v. Board of Governors*, 533 F.2d 224, 231 (5th Cir. 1976).

 This argument disregards both the plain meaning of the statute and the most recent expressions of congressional intent. The legislative histories of the Bank Holding Company Act and the 1966 and 1970 amendments to the Act contain nothing to support the conclusion that a state's authority to forbid foreign companies from acquiring banks within that state includes the right also to forbid them from acquiring companies offering services closely related to banking. Moreover, although defendant and amicus are correct concerning the general intent of the Act (preventing the concentration of financial power by bank holding companies), the purpose of the 1970 amendments runs counter to their arguments. The 1970 amendments permit a bank holding company to obtain "any company the activities of which . . . are so closely related to banking . . . as to be a proper incident thereto," and not just companies "all the activities of which are of a financial, fiduciary, or insurance nature," as the Act provided prior to 1970. The congressional history of the amendments makes clear that Congress in 1970 intended to expand the range of business activities in which bank holding companies could engage, giving them greater flexibility and latitude. *See National Courier Association v. Board of Governors*, 170 U.S.App. D.C. 301, 308–09, 516 F.2d 1229, 1236–37 (1975); Chase, *The Emerging Financial Conglomerate : Liberalization of the Bank Holding Company Act*, 60 Geo.L.J. 1225 (1972); Comment, *Implementation of the Bank Holding Company Act Amendments of 1970: The Scope of Banking Activities*, 71 Michigan L.Rev.1970 (1973); Legislation Note, *The Bank Holding Company Act Amendments of 1970*, 39 Geo.Wash.L.Rev. 1200 (1971). The Florida statutes at issue here, by drastically curtailing the rights of foreign bank holding companies and their subsidiaries to engage in banking-related businesses in this state, are at least inconsistent with, if not contrary to, the desires of Congress.

In addition, it is difficult to read § 1842(d), which specifically consents only to state prohibition of the acquisition of *banks* by out-of-state holding companies, as authorizing prohibition of the acquisition of banking-related businesses. "Bank", as used in the Bank Holding Company Act, is a term of art with a definite meaning: "Any institution . . . which (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U.S.C. § 1841(c). If Congress had intended to allow state prohibition of the acquisition of non-banking subsidiaries, it could easily have so provided; since § 1842(d) refers only to "banks," the plain meaning of its language must prevail. Thus, § 1842(d) contains no authority for concluding that a state may bar foreign bank holding companies from acquiring non-banking subsidiaries, as well as banks, within its jurisdiction.

In holding that Florida Statutes § 660.10 and a portion of Florida Statutes § 659.-141(1) are unconstitutional, we intend no disparagement of the traditional authority of Florida and all other states under their police powers to fairly and evenhandedly regulate banks, bank holding companies, trust companies and like financial institutions. As amicus has so vigorously pointed out, the banking trade historically has been subject to a system of dual federal and state regulation, a system which Congress has endeavored to preserve over the years. Sections 1842(d) and 1846 of Title 12, and similar laws, represent the statutory embodiment of this national policy. Nevertheless, when Congress, in the exercise of its paramount authority over commerce, has not explicitly countenanced the type of overt discrimination against interstate commerce involved in this case, the judiciary must intervene in order to ensure that the freedom of trade between the states guar-

anteed by the commerce clause is protected.[12]

Accordingly, an order will issue declaring that Florida Statutes § 660.10 and the affected portion of Florida Statutes § 659.-141(1) are invalid as violative of the commerce clause and enjoining the further enforcement of § 659.141(1) against plaintiffs. Since plaintiffs have yet to attempt to establish a trust company subsidiary in Florida, injunctive relief barring the enforcement of Florida Statutes § 660.10 would be premature, and therefore inappropriate, at this time.

---

**12.** We recognize, too, as defendant and amicus have noted, that many other states have passed laws similar in nature to § 660.10. *See* Annotation, *Eligibility of Foreign Corporation to Appointment as Executor, Administrator, or Testamentary Trustee,* 26 A.L.R.3d 1019 (1969).

In addition, § 660.10 has survived on the statute books without constitutional challenge for approximately 50 years. A statute's longevity or commonplace nature, however, is an insufficient rationale for justifying its demonstrated discrimination against interstate commerce.