Walter J. FLECK, Edyth A. Hamler, E. A. Richert, as Fiduciary of the Allied Structural Steel Company Salaried Employees' Pension Plan, and Allied Structural Steel Company, a Delaware Corporation, Plaintiffs,

v.

Warren SPANNAUS, E. I. Malone, Phyllis Speilman and Allied Structural Steel Company Salaried Employees' Pension Plan, Defendants.

No. 3–75 Civ. 178.

United States District Court,
D. Minnesota,
Third Division.

Sept. 2, 1977.

As amended Sept. 22, 1977.

See, also, D.C., 421 F.Supp. 20.

Dennis J. Carlin, Maurice J. McCarthy, Chicago, Ill., John R. Kenefick, Briggs & Morgan, St. Paul, Minn., for plaintiffs.

Warren Spannaus, Atty. Gen., by Kent G. Harbison, Sp. Asst. Atty. Gen., Richard A. Lockridge, St. Paul, Minn. for Warren Spannaus, E. I. Malone and Phyllis Speilman.

Frank C. Heath, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Curtis L. Ray, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., amici curiae, for White Motor Corp. and White Farm Equipment Co.

## MEMORANDUM OPINION

Before HEANEY, Circuit Judge, and DEVITT and ALSOP, District Judges.

HEANEY, Circuit Judge.

The plaintiffs brought this action to contest the enforceability and constitutionality

of the Minnesota Private Pension Benefits Protection Act, Minn.Stat. § 181B.01 *et seq.* (1974) (hereinafter the Pension Act). The relevant facts are set forth in *Fleck v. Spannaus,* 412 F.Supp. 366 (D.Minn.1976). In that decision, Judge Alsop held that the Pension Act was not preempted by the Employee Retirement Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (hereinafter ERISA) until January 1, 1975, and that a three-judge court was necessary to decide the various constitutional issues raised. On August 5, 1976, the three-judge court certified several questions to the Minnesota Supreme Court concerning the Pension Act's "self-destruct" provisions and held that the individual plaintiffs, two employees of Allied Structural Steel Company (hereinafter Allied) and the pension fund trustee, lacked standing to sue. In addition, the court ordered the appointment of a special master to take evidence and make findings on certain factual matters.

Pursuant to Judge Alsop's certification order, the Minnesota Supreme Court held that the Pension Act continued in effect until January 1, 1975, when the provisions of ERISA preempted the state act and that this preemption preserved the pending causes of action. In other words, the terms of the Pension Act were in force and applicable to the eleven employees terminated by Allied on July 31, 1974.

On April 7, 1977, the special master issued his findings to which the parties subsequently stipulated. In particular, he found that:

1) it was impossible to determine which contributions by Allied to the plan were allocable to the terminated employees;

2) there were insufficient assets in the pension fund to pay the terminated employees after paying all employees who had vested rights under the plan;

3) the possibility of a plant closure was not considered in calculating Allied's annual contributions to the pension plan; and

4) the cost of prepaid deferred annuities which Allied would have to purchase

for the terminated employees ranged from \$114,171.93 to \$185,751.00.

Before this · three-judge court, Allied claims the Pension Act suffers the following constitutional infirmities:

1) it impairs the obligation of contract; and

2) it violates the due process, equal protection and commerce clauses of the United States Constitution.

Although Allied raises each of these issues in its initial complaint, they seem to rely almost entirely on the contract clause argument. Accordingly, our decision will focus primarily on this issue.

I. *The Impact of United States Trust Co. of New York v. New Jersey.*

Over the last century, the contract clause of the United States Constitution has played a limited role in constitutional adjudications concerning limitations on state power. A recent decision of the United States Supreme Court, *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), provides the most definitive statement on the current status of the contract clause. This case involved a statutory covenant between New York and New Jersey which limited the ability of the Port Authority to subsidize rail passenger transportation from revenues and reserves pledged as security for bonds issued by the Authority. In 1974, the legislatures of both states repealed the security promise in the 1962 covenant. The legislation was sought when it became apparent that, in providing a greater share of its revenues for rail mass transit, Port Authority reserves would drop below levels promised as security in the original covenant. *United States Trust Co. of New York v. New Jersey, supra* at 431 U.S. 10–13, 97 S.Ct. 1511–1513, 52 L.Ed.2d 102–104.

In assessing the bondholders' contract clause challenge, the Supreme Court began by drawing an important distinction between general regulatory legislation impairing a range of private contracts and legislation abrogating a particular contract

to which the state was a party. As to the former, the Court acknowledged that a more relaxed standard of review must apply; but when the state itself was a party, it conceded that complete deference to the legislature's judgment was inappropriate.

> The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. * * * As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.
>
> * * * * * *
>
> In applying this standard [to the instant case], however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised.

*United States Trust Co. of New York v. New Jersey, supra* at 431 U.S. 22, 97 S.Ct. 1517, 52 L.Ed.2d 109–110, 112.

Thus, an important first step in analyzing the constitutionality of a particular impairment is to determine the nature of the contractual relation with which the law conflicts.

A second issue addressed by the Court in determining the constitutionality of a particular impairment is the extent of that impairment. *Id.* at 27, 97 S.Ct. at 1520, 52 L.Ed.2d at 113. Without drawing a clear distinction between substantial and insubstantial impairments, the Court, at several points in the opinion,[1] suggested that a factor to be considered in determining the extent of impairment is the legitimate expectations of the contracting parties. Apparently, to the extent the obligation imposed or abrogated by the challenged legislation was, in fact, or could have been anticipated by the contracting parties, the impairment of those bargained for expectations is diminished.

Ultimately, the Court held that an impairment can be sustained only if reasonable and necessary to serve important purposes of the state. *Id.* at 28, 97 S.Ct. at 1521, 52 L.Ed.2d at 114. Total repeal of the 1962 covenant was not necessary, in the Court's judgment, because less drastic modifications of the security terms would have accomplished the state's objectives. The legislation was not reasonable because the state was well aware of pending mass transit problems when the covenant was enacted. *Id.* at 28, 30, 97 S.Ct. at 1521, 1522, 52 L.Ed.2d at 114–115.

With this review of the Supreme Court's most current statement on the contract clause, we now turn to the instant case.

## II. *The Extent of Impairment.*

Allied argues and the State of Minnesota seems to concede that there has been an impairment of contract. Our attention is directed then to the extent of that impairment. In this regard, Allied contends that the impairment is substantial because the Pension Act burdens employers with pension obligations that were not actuarially anticipated.[2] First, Allied argues that their

---

1. *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92, n. 17, n. 26 (1977).

2. The actuarial assumptions and funding method used in developing the Allied pension plan are set forth at Exhibit 7 of the Special Master's Findings:

> Mortality rates—Group Annuity Table for 1951 projected to 1960, set back 5 years for women.
> Disability rates:

| Age | Rate (%) |
|-----|----------|
| 37 | .1 |
| 42 | .1 |

| Age | Rate (%) |
|-----|----------|
| 47 | .2 |
| 52 | .6 |
| 57 | 1.1 |
| 62 | 3.2 |

Termination rates before retirement, all causes:

| Age | Rate (%) | |
|-----|-----|-------|
| | Men | Women |
| 22 | 5.4 | 5.4 |
| 27 | 4.5 | 4.5 |
| 32 | 3.3 | 3.3 |
| 37 | 2.0 | 2.0 |
| 42 | 1.0 | 1.0 |

contributions to the pension plan were actuarially determined on the basis of certain assumptions and that by providing benefits to those who would have forfeited their benefits under those assumptions, unanticipated liability is imposed. This argument is belied by Allied's own admission that the possibility of plant closure was not relied upon by their actuaries in calculating plan contributions.[3]

Closely paralleling the preceding argument, Allied claims that the ten-year vesting provision of the Pension Act imposes liability which was not anticipated by Allied or its actuaries. We do not quarrel with their claim that an acceleration of vesting was not anticipated and that the Pension Act impaired Allied's employment agreements in this regard. Nevertheless, we do not believe the obligations imposed by the Pension Act unconstitutionally expand upon the contracting parties initial expectations or the actuaries' original assumptions.

Generally, employer contributions to pension plans are determined in the following fashion. Actuaries first calculate the amount an employer is likely to pay out in benefits over the course of the plan; this calculation, of course, is based on certain assumptions regarding mortality, job changes, and other causes of employee turnover.[4] To meet this anticipated liability, the actuaries next project the amount an employer must contribute to adequately fund these future payments. For example, an actuary may determine that annual contributions of two or three percent of payroll are necessary to meet the first series of anticipated payments and to accumulate an interest-earning reserve to cover the remainder of the plan.

Certainly, Allied did not and could not be expected to anticipate the possibility

|  | Rate (%) | |
|---|---|---|
| Age | Men | Women |
| 47 | .7 | .5 |
| 52 | 1.3 | 1.0 |
| 57 | 2.2 | 1.8 |
| 62 | 4.9 | 4.3 |

Salary scale:

| Age | Present salary as a percent of salary at 65 |
|---|---|
| 22 | 33.1% |
| 27 | 40.9 |
| 32 | 49.0 |
| 37 | 57.4 |
| 42 | 65.9 |
| 47 | 74.4 |
| 52 | 82.8 |
| 57 | 91.1 |
| 62 | 98.2 |

Retirement age—66, or completion of service requirement if later.

Interest rate—4½%.

Valuation of assets—At cost, with accrual of unpaid company contribution.

Funding method—Entry age normal cost-frozen initial liability.

3. Allied's argument in this regard does highlight a different aspect of the termination problem. Because plant closure is not actuarially anticipated, forfeiture of pension benefits for this reason may actually provide a windfall to the employers. As noted in *Lucas v. Seagrave Corporation*, 277 F.Supp. 338, 345 (D.Minn. 1967):

> [I]t has been asserted that an employer's pension plan contributions are determined by an actuarial formula which assumes that any employee whose employment is terminated forfeits his pension benefits. * * * However, such an assumption may not cover the occurrence of a group termination. The actuarial formula assumes a reasonable turnover rate for employees established by experience with individual separations over a period of time. Where there is a termination of a substantial number of the plan participants, it seems clear that such a turnover is not anticipated by the formula. The result is that an employer who has discharged a relatively large number of employees receives a windfall, palpably in excess of actuarial assumptions, in the form of pension credit forfeitures which he can use to relieve for some time his future premium liability for the remaining employees.

(Footnote and citation omitted).

4. *See* n. 3, *supra*. We note again that these assumptions do not include the prospect of plant closure.

of vesting at an earlier date for the terminated Minnesota employees. But, the claim that payment to these employees was not anticipated distorts the way actuarial assumptions and funding plans operate and ignores the fact that a portion of Allied's annual contribution was made to accumulate a reserve sufficient to make payments to these employees at some future date. In other words, while the date of payment could not be anticipated, the likelihood of payment was, as was the need, to accumulate a reserve for that purpose.

We raise the preceding arguments not to suggest that a sufficient fund has accumulated in the Allied pension plan out of which Pension Act liabilities can be paid. In fact, the Pension Act does not impose any liability on pension plan funds for the payment of forfeited benefits. The Act specifically provides that the *employer* is liable for payment of the pension funding charge and that funds already contributed to the plan are to remain for the benefit of continuing employees. *See* Minn.Stat. §§ 181B.03–.07 and 181B.16 (1974). Rather, the arguments raised above are offered to shed some light on the concerns expressed by the Supreme Court in *New York Trust* for the "legitimate expectations of the contracting parties." We believe the obligations imposed by the Pension Act are not so significantly beyond the parties' initial expectations that the Act should be declared unconstitutional.

### III. *The Reasonableness and Necessity of the Impairment.*

■ As reaffirmed in *New York Trust,* the standard for reviewing state legislation impairing private contracts varies with the nature of that contractual relationship. When the state is not a party to the contract, far greater deference is given to the legislative judgment that the impairment is reasonable and necessary to the accomplishment of legitimate policy aims. In granting states broader powers to adopt general regulatory measures, it is probably assumed that the legislature will act impartially and in the best interest of all when it is not itself a party to the contract impaired. Note, *The Constitutionality of the New York Wage Freeze and Debt Moratorium: Resurrection of the Contract Clause,* 125 U.Pa.L.Rev. 167, 188–191 (1976). Since the State of Minnesota was not a party to the contracts allegedly impaired by the Pension Act,[5] we must review that legislation with considerable deference to the policy judgments of the Minnesota legislature.

■ Before addressing the reasonableness and necessity of the Pension Act provisions, we must first examine the various policy aims that led to its enactment. *United States Trust Co. of New York v. New Jersey, supra* at 431 U.S. 25, 97 S.Ct. 1519, 52 L.Ed.2d 112. When plants shut down, employees lose both their jobs and, in many cases, their pension rights. Accumulated pension credits may be forfeited even when terminated employees are within a few months of qualifying for retirement. Bernstein, *Employee Pension Rights When Plants Shut Down: Problems and Some Proposals,* 76 Harv.L.Rev. 952 (1962) (hereinafter Bernstein). The loss sustained by separated employees can be viewed either as a future loss of retirement income or as a present loss of compensation corresponding to the amount of employee contributions on their behalf.

---

5. The contracts allegedly impaired by the Minnesota Pension Act are: (1) the employment agreements entered into by Allied and its employees, and (2) the trust agreement between Allied and the trustee of its pension plan. The terms of the employment agreements included wage rates, working conditions and fringe benefits, one of which was a pension plan with vesting to occur after twenty years. The Pension Act allegedly impairs those agreements in that it requires vesting of pension benefits after ten years if Allied ceases to do business or substantially reduces its work force in Minnesota. The terms of the trust agreement require payment by Allied in accord with actuarial projections which are predicated on vesting after twenty years. The Pension Act allegedly impairs that agreement because Allied must incur additional expense to provide benefits for persons whose benefits would be forfeited by plant closure.

Certainly, the State of Minnesota has a strong and legitimate interest in protecting the economic welfare of its senior citizens by assuring the receipt of earned pension benefits as a form of retirement income. The forfeiture of anticipated retirement income is particularly hazardous because it affects individuals at an age when they often have no other source of substantial income.[6] Mass forfeiture of retirement benefits is likely to adversely affect the employees' immediate economic community through the loss of buying power and increased demand for welfare funds and related services.[7]

But, in our judgment, the loss of retirement income is only one aspect of the problem. Pension plans are usually instituted as a means of attracting and holding employees. Bernstein, *supra* at 964. Individuals who decide to work for an employer who offers a pension plan over an employer who does not, choose, in essence, to sacrifice the higher salary the non-plan employer may pay for the security of retirement income. Employer contributions to pension funds must be recognized as a substitute for present compensation. As one authority explains,

> Unions and employers are often quite specific in equating employer pension plan contributions with employee wage compensation. Unions demand increases of X cents per hour in money wages and Y cents per hour in fringe benefits, including pension plan contributions. Employers respond with counter-offers in precisely the same terms.

\* \* \* \* \* \*

> The basic purposes of nonbargained plans are the same as those of bargained plans. As far as employees are concerned the purposes of the plan are to provide income when age forces retirement from employment. \* \* \* Thus, as a general proposition, nonbargained plans seem no less a part of employee compensation than bargained plans.

> Since the *Inland Steel*[8] case the courts and the National Labor Relations Board have held pension plans to be "wages" and, in addition, "condition[s] of employment" under the Labor-Management Relations Act of 1947 and its predecessor, the Wagner Act. \* \* \* The demand to bargain [in *Inland Steel*] did not turn the contribution and the pension plan into "wages"; rather it was the nature of the inducement by the company to the employees and the value of the contributions and the benefits to the employees which made them "wages."

Bernstein, *supra* at 960–961.

Thus, the loss sustained by terminated employees has both present and future implications for the employees themselves and for their immediate community. We have no trouble concluding that the Minnesota

---

**6.** The three major sources of income for those of retirement age are private pensions, social security benefits and private savings. *See* C. Siegfried, *"The Role of Private Pensions" in Private Pensions and the Public Interest* 7, 9 (1970). While social security benefits are available to a wide segment of the elderly population, those benefits by themselves seldom provide sufficient income to meet ever-increasing costs of living. *See, e. g.,* R. Nader and K. Blackwell, *You and Your Pension* 13 (1973). And it is widely acknowledged that few individuals are able to accumulate sufficient savings through their working years to provide significant income after retirement. *See generally* M. Bernstein, *The Future of Private Pensions* 155–157 (1964).

**7.** Congress explicitly recognized the same concerns during hearings on the bills that were eventually enacted into law as ERISA:

> One of the most important matters of public policy facing the nation today is how to assure that individuals who have spent their careers in useful and socially productive work will have adequate incomes to meet their needs when they retire.

S.Rep. No. 93–383, 93rd Cong., 2d Sess. (1974); Pension Reform Act, *U.S.Code Cong. & Admin.News,* pp. 4639, 4898 (1974); H.R.Rep. No. 93–807, 93rd Cong., 2d Sess. (1974), Pension Reform Act, *U.S.Code Cong. & Admin. News,* pp. 4639, 4676 (1974).

**8.** *Inland Steel Co. v. N. L. R. B.,* 170 F.2d 247 (7th Cir. 1948), *cert. denied,* 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 *cert. granted on other grounds and aff'd,* 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1949).

legislature, in enacting the Pension Act, was addressing a problem of vital public interest.

█ The next area of inquiry is whether the terms of the Pension Act are reasonably adapted to and necessary for the accomplishment of these vital interests. We think they are. Allied contends that the provisions of the Act are neither reasonable nor necessary because: (1) the Act was designed to benefit only a limited class of persons, (2) the Act does not provide for a grace period during which an employer whose pension plan was not fully funded might reach full funding, and (3) the Act does not permit employers to voluntarily terminate their pension plans.

Admittedly, the Pension Act does not address all the problems existing in private pension programs. The Act prevents only the forfeiture of accumulated pension benefits by substantial numbers of employees when that forfeiture is caused by plant closure. It is well established, however, that in exercising its police powers, a state need not address all aspects of a particular problem. As observed by the Supreme Court in an analogous police power decision,

> [i]n establishing a system of unemployment benefits the legislature is not bound to occupy the whole field. It may strike at the evil where it is most felt.

*Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 519–520, 57 S.Ct. 868, 877, 81 L.Ed. 1245 (1937) (citations omitted). It seems clear that the problem of plant closure and pension plan termination was brought to the attention of the Minnesota legislature when the Minneapolis-Moline Division of White Motor Corporation closed one of its Minnesota plants and attempted to terminate its pension plan. However, Allied's contention that the Pension Act was aimed solely at White Motor retirees is totally unfounded. There is absolutely no evidence from the legislative history or debates on the Pension Act to support Allied's claim that the Act was aimed solely at White Motor Corporation.

Allied's other contentions that a grace period was not allowed and that there was

no option to voluntarily terminate its plan can be answered quite simply. Undoubtedly, the Minnesota legislature rejected both of these alternatives because either would have been inconsistent with the Act's central purpose—to assure some measure of retirement income to those affected by present plan closures and plan terminations. Although the legislature might have adopted a less drastic means to accomplish its purpose, the approach it chose is not unreasonable or arbitrary merely because it requires funding to commence from the date of enactment.

## IV. *The Commerce Clause Challenge.*

█ Allied claims that interstate commerce is unreasonably burdened because the Pension Act's funding charge discourages Minnesota employers from terminating their operations in this state and moving them or their investment capital elsewhere. Relying on *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), Allied argues that the Pension Act, in effect, requires business operations to be performed in the home state even when those operations could be more efficiently performed in another. *Id.* at 145, 90 S.Ct. 844. In *Pike,* the Supreme Court set forth the standard for determining whether state legislation unduly burdens interstate commerce:

> Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443, [80 S.Ct. 813, 4 L.Ed.2d 852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local

interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142, 90 S.Ct. at 847 (citation omitted). It is clear from the statutory language of the Pension Act that local and interstate commerce are treated alike. Any employer of 100 or more employees who terminates a pension plan or ceases operations in the state is affected by the Act. *See* Minn. Stat. §§ 181B.02, subd. 2, 181B.03–06. As held above, the Act clearly effectuates a vital and legitimate policy of local interest. Thus, the question becomes whether the burden imposed on interstate commerce is excessive in relation to that legitimate local benefit. We do not think it is excessive.

The Pension Act burdens commerce in much the same way as other forms of employer protection legislation; the costs of doing business in Minnesota are increased to further an important state policy. Costs of a similar nature are imposed by workmen's compensation, unemployment compensation and social security statutes and each has been upheld against constitutional attack. *See Helvering v. Davis,* 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937) (social security); *Carmichael v. Southern Coal and Coke Co.,* 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937) (unemployment compensation); *Mountain Timber Co. v. Washington,* 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917) (workmen's compensation). The local policy effectuated by the Pension Act is equal in importance to aims achieved by the preceding legislation. In our judgment, this vital interest outweighs the attendant burdens on interstate commerce.[9]

## V. *The Due Process Challenge.*

Allied asserts that the Pension Act violates the due process clause of the fourteenth amendment by divesting Allied of property rights—the right to withhold pension benefits for failure to meet age and service requirements it had contracted for prior to the Act's passage. The considerations involved in Allied's due process challenge are substantially the same as those previously considered under the contract clause. We have held that the Pension Act is a valid exercise of the state's police power aimed at protecting an important and legitimate interest of certain state residents. For that reason, we need only address here those arguments peculiar to Allied's due process challenge: namely, whether the Pension Act is retroactive in application and, if so, whether that retroactivity violates the due process clause.

Allied argues that the Pension Act's funding charge is based on pension benefits earned prior to enactment of the legislation. It is true that the Act does look to service performed prior to enactment to determine the amount of accumulated benefits, but the events which trigger the funding charge all occur after the effective date of the Act, April 10, 1974. Thus, the Act is directed only at forfeitures which arise from plant closures occurring after April 10. *Accord, Willys Motors v. Northwest Kaiser-Willys,* 142 F.Supp. 469 (D.Minn. 1956). Allied closed its Minnesota plant on July 31, 1974, over three months after the effective date of the Pension Act.

---

**9.** Two recent Supreme Court cases sustaining commerce clause attacks on state legislation do not compel a contrary result. Both involved state interests of considerably less importance. In *Great Atlantic and Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976), the State of Mississippi claimed that a regulation allowing the sale of out of state milk products in Mississippi only if the selling state accepted Mississippi milk products on a reciprocal basis was enacted to maintain state health standards. The Court regarded this purported justification as "border[ing] on the frivolous." *Id.* at 375, 96 S.Ct. 923. In *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), an Arizona statute required cantaloupes grown in the state to be packed in conformity with certain standards and approved by a state supervisor. The practical effect of the statute was to compel an Arizona grower, with adequate packing facilities thirty-one miles away in California, to build similar facilities in Arizona. *Id.* at 140, 90 S.Ct. 844. The purpose of the statute was simply "to protect and enhance the reputation of growers within the State." *Id.* at 143, 90 S.Ct. at 848. The Court held, "such an incidental consequence of a regulatory scheme could perhaps be tolerated if a more compelling state interest were involved. But here the State's interest is minimal at best. * * *" *Id.* at 146, 90 S.Ct. at 849.

■ Even if we found the Act to operate retroactively, that alone does not render a statute invalid. It is well settled that legislation aimed at a legitimate local interest may be valid irrespective of any retroactivity. *See, e. g., Usery v. Turner Elkorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). The Supreme Court set forth the relevant test for determining whether retroactive legislation is valid as an exercise of the state's police power in *Goldblatt v. Town of Hempstead, supra*:

> To justify the state in * * * interposing its authority in behalf of the public, it must appear, first, that the interests of the public * * * require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

*Id.* at 594–595, 82 S.Ct. at 990, *quoting Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894).

For the reasons stated above, we believe the Pension Act accomplishes a vital public interest, is reasonably adapted to that end and is not unduly oppressive in its impact on Allied. It is valid, therefore, irrespective of any alleged retroactive effect.

### VI.  *The Equal Protection Challenge.*

■ Allied commences its equal protection challenge with the claim that in recent years, the "rational basis" standard for determining the validity of state statutes has been replaced by a new test which requires that the classification bear a substantial and significant relation to its claimed objective. *Women's Liberation Union of Rhode Island, Inc. v. Israel,* 379 F.Supp. 44, 49–50 (D.R.I.1974), *aff'd,* 512 F.2d 106 (1st Cir. 1975). *See Dorrough v. Estelle,* 497 F.2d 1007, 1011 (5th Cir. 1974);

*Lucas v. Secretary, Dept. of HEW,* 390 F.Supp. 1310 (D.R.I.1975). A close examination of these decisions reveals that the emerging middle standard of review, somewhere between the rational basis test and strict judicial scrutiny, has been applied to classifications falling just short of the "suspect classification" category or of infringing fundamental rights.[10] Recent decisions of the Supreme Court demonstrate unequivocally that where business or economic regulation is at issue and no potentially suspect classification is involved, the traditional rational basis standard still applies. *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Village of Belle Terre v. Borass,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Thus, because Allied challenges local economic regulation, we must give considerable deference to the classifications chosen by the legislature and uphold those classifications "if any state of facts reasonably may be conceived to justify [them]." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

■ The first set of challenged classifications are readily justified under the relevant standard. They are:

1) the Act's regulation of employers with more than 100 employees while failing to cover smaller employers; and

2) the Act's exclusion of state and local government employees and employees of tax-exempt organizations.

In our judgment, these exclusions are based on rational policy aims. First, national and statewide experience indicated that plan terminations by major private businesses caused hardship to the greatest number of aged citizens and imposed the most severe burden on states to remedy those hardships

---

**10.** In *Dorrough v. Estelle,* 497 F.2d 1007 (5th Cir. 1974), the emerging middle standard was applied to the classifications in a Texas statute denying a criminal appeal to certain classes of criminal escapees. A Rhode Island statute excluding women from certain types of bars was more carefully examined by the court in *Women's Liberation Union of Rhode Island, Inc. v.*

*Israel,* 379 F.Supp. 44 (D.R.I.1974), *aff'd,* 512 F.2d 106 (1st Cir. 1975). Finally, in *Lucas v. Secretary, Dept. of HEW,* 390 F.Supp. 1310 (D.R.I.1975), the court followed the standard applied in *Women's Liberation Union of Rhode Island, Inc. v. Israel, supra,* to strike down distinctions drawn between legitimate and illegitimate children.

through public assistance. Certainly, it was not unreasonable for the legislature to fashion a remedy appropriate to the most immediate need. Similarly, tax-exempt organizations and state and local government employers were excluded because the legislature determined the need for protection was greatest in private industry of substantial size. ERISA excludes tax-exempt and public employees for the same reason. 29 U.S.C. § 1003(b)(1), (2).

■ Allied also attacks the exclusion of employers who have made the maximum allowable contribution deductible under § 404 of the Internal Revenue Code for a designated sum of years preceding termination. This exclusion is justifiable on the ground that one of the Pension Act's obvious purposes is to encourage employers to fund their plan to the maximum extent possible. It seems perfectly reasonable to exclude those employers who have attempted to maintain a relatively high funding level. The maximum deductible contribution was simply taken as a readily identifiable bench mark for separating out plans more likely to be adequately funded.

■ Finally, Allied challenges the Pension Act's exclusion of "non-qualified" plans under § 401 of the Internal Revenue Code. The defendants argue that this classification was drawn to reduce the coverage of the Act to make it administratively manageable. While we have some doubts about this rationale, there is justification for assuring that state resources allocated to policing the Act are kept within manageable limits. *See Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976).

For these reasons, we find no violation of the equal protection clause.

In accord with the preceding discussion, the Pension Act is sustained against each constitutional challenge.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. Judgment will be entered in favor of defendants Warren Spannaus, E. I. Malone, Phyllis Speilman and against Allied Structural Steel Company. Costs and disbursements will be taxed to the plaintiffs.