# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1115

_____

Association of Equipment Manufacturers; AGCO Corporation; CNH Industrial America LLC; Deere & Company; Kubota Tractor Corporation,

*Plaintiffs - Appellees*,

v.

The Hon. Doug Burgum, Governor of the State of North Dakota, in his official capacity; The Hon. Wayne Stenehjem, Attorney General of the State of North Dakota, in his official capacity,

*Defendants - Appellants*,

North Dakota Implement Dealers Association,

*Intervenor Defendant - Appellant*.

------------------------------

International Franchise Association,

*Amicus on Behalf of Appellee(s)*.

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: November 13, 2018
Filed: August 2, 2019

_____

Before COLLOTON, SHEPHERD, and STRAS, Circuit Judges.

_____

COLLOTON, Circuit Judge.

The Association of Equipment Manufacturers and four farm equipment manufacturers asked the district court[1] to enjoin North Dakota Senate Bill 2289, which regulates relationships between manufacturers and farm equipment dealers. The district court granted a preliminary injunction on the ground that the Act likely violated rights of the manufacturers under the Contract Clause of the Constitution, U.S. Const. art. I, § 10, cl. 1.  The State of North Dakota and an intervenor, the North Dakota Implement Dealers Association, appeal that order.  We affirm.

I.

Senate Bill 2289 is an Act "to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair."  *See* 2017 N.D. Laws, ch. 354 (codified at N.D. Cent. Code §§ 51-07-01.2, 51-07-02.2, 51-26-06 (2017)).  The legislation contains three sections. The first section applies "[n]otwithstanding the terms of any contract," and prohibits manufacturers from imposing various contractual obligations on farm equipment dealers.  *See id.* sec. 1 (N.D. Cent. Code § 51-07-01.2, § 1).  Manufacturers, for example, cannot require dealers to maintain exclusive facilities, "unreasonably" refuse to approve the relocation of dealerships, or impose "unreasonable" performance standards on dealers.  *Id.* sec. 1 (N.D. Cent. Code § 51-07-01.2, § 1.e, .i, .k).

_____

[1]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

The second section regulates dealership transfers and permits a dealer to transfer a dealership agreement after notice to the manufacturer and approval of the manufacturer. Certain denials by manufacturers are presumed unreasonable, and the section allows a dealer to file an action challenging a manufacturer's denial. *Id.* sec. 2. A third section imposes several new requirements on manufacturers with respect to reimbursements that they must provide to dealers for warranty repairs. *Id.* sec. 3. Although the last two sections do not contain language specifying retroactive application, the State does not dispute the district court's conclusion that they apply to existing contracts, and the State generically describes SB 2289 as "retroactive." *Cf. Smith v. Baumgartner*, 665 N.W.2d 12, 14-16 (N.D. 2003).

The manufacturers sued and raised claims under several constitutional and statutory provisions, including the Contract Clause and the Federal Arbitration Act. The district court entered a preliminary injunction against enforcement of SB 2289, concluding that the manufacturers were likely to succeed on the merits of their Contract Clause claim and that the other relevant factors weighed in favor of a preliminary injunction. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The court reasoned that SB 2289 imposed unforeseeable new regulations on existing contracts that amounted to substantial impairments. Citing the statement of a co-sponsor in the legislature that the bill was designed to create a "level playing field" for implement dealers, the court determined that the Act was special-interest legislation unsupported by a significant and legitimate public purpose. The court also ruled that SB 2289's retroactive "No Arbitration" provision, which says that a manufacturer generally may not require a dealer to agree to arbitration, *see* 2017 N.D. Laws, ch. 354, sec. 1 (N.D. Cent. Code § 51-07-01.2, § 1.l), was preempted by the Federal Arbitration Act, 9 U.S.C. § 2.

The State appeals the district court's order, disputing the conclusion that the manufacturers are likely to succeed on the merits of their Contract Clause claim. An

order granting a preliminary injunction is reviewed for abuse of discretion. *TCF Nat'l Bank v. Bernanke*, 643 F.3d 1158, 1162 (8th Cir. 2011).

## II.

In determining whether a state law passes muster under the Contract Clause, "[t]he threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). If the answer is yes, then the court asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* at 1822 (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983)). "The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002); *see also Energy Reserves Grp.*, 459 U.S. at 411-12. If the State shows a significant public purpose and is not a contracting party, then "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves Grp.*, 459 U.S. at 412-13 (quoting *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977)).

The State contends that SB 2289, although retroactive, does not "substantially impair" the manufacturers' contractual rights. This court, distilling the jurisprudence on substantial impairment, has concluded that the governing rule is akin to a question of reasonable foreseeability: "if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed." *Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383, 385 (8th Cir. 1994).

We conclude that the manufacturers in this case "cannot reasonably be said to have had a fair and appreciable warning of an impending intervention into their agreements." *Id.* Several provisions regulating dealer agreements are new additions

to the North Dakota Century Code or significantly expand existing provisions. *See* 2017 N.D. Laws, ch. 354, sec. 1 (N.D. Cent. Code § 51-07-01.2, § 1.d, .e, .h, .i, .j, .k, .l), sec. 3. Previous regulations, moreover, forbade primarily coercive and discriminatory practices; for example, a manufacturer could not "[c]oerce or attempt to coerce" a dealer into accepting delivery of equipment the dealer had not voluntarily ordered. *See* 1991 N.D. Laws, ch. 521, sec. 1. SB 2289, by contrast, includes several amended and new provisions that forbid manufacturers from "requir[ing]" dealers to take certain actions, "[n]otwithstanding the terms of any contract." *See* 2017 N.D. Laws, ch. 354, sec. 1 (N.D. Cent. Code § 51-07-01.2, § 1.a, .c, .d, .e, .h, .l). The law thus goes a significant step beyond regulation of coercive and discriminatory practices by rendering unenforceable obligations that dealers previously accepted as part of freely negotiated contracts. *See Equip. Mfrs. Inst.*, 300 F.3d at 858-59. The new law also substantially enlarged the regulation of dealer reimbursements that had been limited to rules about reimbursement for labor. *See* 2017 N.D. Laws, ch. 354, sec. 3 (N.D. Cent. Code § 51-26-06, §§ 1, 2 (regulating reimbursement for transportation services, diagnostic work, repair service, warranty work compensation, product improvement programs, maintenance plans, extended warranties, and certified preowned warranties)).

This court previously held that a similar retroactive law governing agreements between farm equipment dealers and manufacturers in South Dakota violated the Contract Clause. *See Equip. Mfrs. Inst.*, 300 F.3d at 848-49, 859-62. Some provisions of the North Dakota law parallel the South Dakota statute by expanding prohibitions on coercion to regulate existing contracts, and the manufacturers were entitled to rely on the South Dakota precedent when considering what legislative impairments were reasonably foreseeable. *See Holiday Inns Franchising*, 29 F.3d at 385. For all of these reasons, SB 2289 substantially impairs obligations of contract.

The State's primary argument is that even if SB 2289 substantially impairs the manufacturers' contractual rights, the legislation reasonably advances a significant

and legitimate public purpose, so the impairment is constitutional. In *Equipment Manufacturers Institute*, South Dakota conceded that the purpose of a similar law was "to level the playing field between manufacturers and dealers," 300 F.3d at 860, and this court concluded that the conceded purpose did not qualify as a "significant and legitimate public interest." *Id.* at 861. North Dakota makes no such concession and asserts that this law furthers a significant public interest in serving farmers and rural communities. But the mere assertion of a conceivable public purpose is insufficient to justify a substantial impairment of contractual rights. Virtually all legislation enacted by multi-member bodies will be motivated by multiple purposes in the minds of individual legislators, but those subjective intentions are not controlling. Whether the law passes constitutional muster requires a more discerning inquiry into the Act's structure and design.

As a matter of the text and original meaning of the Contract Clause, there seems to be little doubt that the North Dakota law would be unconstitutional. The Clause's terms are absolute: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10, cl. 1. The Clause's principal target was debtor-relief legislation that many States had passed in the wake of the Revolutionary War, *see Sveen*, 138 S. Ct. at 1821, but the text is not so limited, and historical context suggests that the Clause was "aimed at all retrospective, redistributive schemes in violation of vested contractual rights." Douglas W. Kmiec & John O. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L.Q. 525, 533-34 (1987). The Supreme Court, through Chief Justice Marshall, understood the Framers "to have intended to establish a great principle, that contracts should be inviolable," and concluded in an early case construing the Clause that the Court "should give these words their full and obvious meaning." *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 205-06 (1819). Even where a state statute was designed to further a legitimate state purpose of assisting poor people who were oppressed by debts, the Contract Clause forbade legislation that discharged contractual liability without performance. *See id.* at 206; Kmiec &

McGinnis, *supra*, at 536-37. The Clause did not prevent a State from regulating health, safety, and morals, *see Stone v. Mississippi*, 101 U.S. 814, 817-19 (1880), but drew the line at efforts "to redistribute resources in violation of vested contractual rights." Kmiec & McGinnis, *supra*, at 541; *see also* Richard A. Epstein, *Toward a Revitalization of the Contract Clause*, 51 U. Chi. L. Rev. 703, 715-16, 730-40 (1984) (arguing that while the Contract Clause encompasses a modest police power limitation, "the transfer of wealth by special-interest politics" is the "evil to which the clause is directed").

Modern jurisprudence, however, has taken a different course. The Court in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934), disavowed that "what the Constitution meant at the time of its adoption it means to-day," or that "the great clauses of the Constitution must be confined to the interpretation which the framers . . . would have placed upon them." *Id.* at 442-43. *Blaisdell* upheld Minnesota's mortgage moratorium law, a form of debtor-relief legislation, against a challenge under the Contract Clause. *Id.* at 447-48. Yet *Blaisdell* did not rest on a mere assertion of conceivable public purpose; the Court cited legislative findings, supported by an adequate factual basis, that documented the existence of an economic emergency. *Id.* at 421 n.3, 444-45; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 486 & n.14 (1987) (upholding state statute where "the legislative purposes set forth in the statute were genuine, substantial, and legitimate").

Since *Blaisdell*, the Court has reaffirmed that the Contract Clause prohibits special-interest redistributive laws, even if the legislation might have a conceivable or incidental public purpose. *Allied Structural* involved a Minnesota law that sought to protect pension benefits for those who worked for a specific class of employers. *See* 438 U.S. at 238. A three-judge district court had "no trouble concluding" that the statute addressed "a problem of vital public interest," namely, "protecting the economic welfare of its senior citizens by assuring the receipt of earned pension benefits as a form of retirement income." *Fleck v. Spannaus*, 449 F. Supp. 644, 650-

51 (D. Minn. 1977). But the Supreme Court reversed, observing that the law had "an extremely narrow focus" because it applied only to certain employers. *Allied Structural*, 438 U.S. at 248. The Court ruled that the statute could "hardly be characterized, like the law at issue in the *Blaisdell* case, as one enacted to protect a broad societal interest." *Id.* at 248-49. As such, the Minnesota law was unconstitutional.

On the other hand, in *Energy Reserves Group*, there was "little doubt about the legitimate public purpose behind" a Kansas law that imposed price controls for natural gas. 459 U.S. at 417. Because the public utility defending the law already could pass through any price increase to its customers, the price controls promised lower prices for consumers, and the public utility would not benefit significantly. *See id.* at 405 n.3, 407 n.6, 418 n.25; *see also* Brief for Appellee at 4-5 & n.12, *Energy Reserves Grp.*, 459 U.S. 400 (No. 81-1370). Under those circumstances, the Court deemed the statute a valid exercise of the State's "police power to protect consumers from the escalation of natural gas prices caused by deregulation." 459 U.S. at 416-17. In short, the inherent pro-consumer nature of the Kansas law and the pre-existing pass-through mechanism made it self-evident to the Court that the law had a broad public purpose and was not special-interest legislation.

So too in *Exxon Corp. v. Eagerton*, 462 U.S. 176 (1983), where a state law prohibited oil and gas producers from passing on a severance tax increase to consumers. The Court reasoned that the statute "imposed a generally applicable rule of conduct designed to advance 'a broad societal interest,'" namely, "protecting consumers from excessive prices." *Id.* at 191 (quoting *Allied Structural*, 438 U.S. at 249). The effect on contracts "was incidental to its main effect of shielding consumers from the burden of the tax increase." *Id.* at 191-92.

*Exxon* did contrast a statute that permissibly imposed "a generally applicable rule of conduct" with an unconstitutional enactment whose "sole effect was to alter

contractual duties"—*i.e.*, one that applied only to existing contracts. *Id.* at 192. But the Court did not say that *only* laws in the latter category can transgress the Contract Clause. *Cf. post*, at 17. If that were so, then this court's decision in *Equipment Manufacturers Institute* would have come out the other way, because the South Dakota law at issue there imposed generally applicable rules for both pre-existing and future dealership agreements. 300 F.3d at 848-49. This court has thus rejected the view that retroactive legislation is *always* permissible under the Contract Clause "so long as the state takes the simple precaution of having its legislation apply *in futuro* as well." *See* Epstein, *supra*, at 739. Even where a law does not have the *sole* effect of altering pre-existing contractual duties, "[t]he State must show that the regulation protects a 'broad societal interest rather than a narrow class.'" *Equip. Mfrs. Inst.*, 300 F.3d at 859 (quoting *Allied Structural*, 438 U.S. at 249).

In evaluating the present North Dakota law governing contracts between manufacturers and dealers, the State "bears the burden of proof in showing a significant and legitimate public purpose underlying the Act." *Id.* at 859. The state legislature declined to follow the examples of the legislatures in *Blaisdell* and *Keystone Bituminous*, which included well-supported findings or purposes within their duly enacted laws, so any significant and legitimate public purpose must be discerned from the design and operation of the legislation itself. Statements in the legislative history of individual legislators, lobbyists, or advocates that the law would benefit farmers and rural communities are insufficient. Special-interest groups cannot establish that legislation serves a broad societal interest simply by ensuring that the record contains testimony or floor statements about a law's conceivable public benefits.

Unlike the statutes at issue in *Energy Reserves Group* and *Exxon*, this North Dakota legislation does not self-evidently further a significant and legitimate public purpose. "[A] state must do more than mouth the vocabulary of the public weal in order to reach safe harbor," *McGrath v. R.I. Ret. Bd.*, 88 F.3d 12, 16 (1st Cir. 1996),

and here the State did not even utter it. The Act nowhere mentions benefits for farmers or rural communities, and it has a narrow focus: restricting the contractual rights of farm equipment manufacturers. The law primarily benefits a particular economic actor in the farm economy—farm equipment dealers. Even if the law indirectly might benefit farmers and rural communities, the Contract Clause demands more than incidental public benefits. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Grp.*, 459 U.S. at 412. The design of this North Dakota legislation fails to provide the requisite guarantee.

Accepting the State's assertion of a sufficient public purpose without a stronger showing would come perilously close to upholding an impairment of contractual obligations based merely on a rational basis—*i.e.*, a rational relationship between the new regulation and a legitimate governmental purpose. Under current doctrine, once a State is deemed to have shown a "significant and legitimate public purpose" for retroactive legislation, the court considers whether the law is drawn in an "appropriate" and "reasonable" way to advance that purpose. *Sveen*, 138 S. Ct. at 1822. At this last step, the Supreme Court has directed courts to defer to the legislative judgment as to necessity and reasonableness, "as is customary in reviewing economic and social regulation." *Energy Reserves Grp.*, 459 U.S. at 412-13 (internal quotation and brackets omitted). Yet the Court also has made clear that the Contract Clause provides greater protection for contractual rights than the "less searching" rational basis standard applied under the Due Process Clauses. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984). To avoid collapsing the specific prohibition of the Contract Clause into the more general Due Process Clause, a reviewing court must require the State to demonstrate more than a conceivable or incidental public purpose for impairing the obligation of contracts.[2]

---

[2]Citing *City of El Paso v. Simmons*, 379 U.S. 497, 508-09 (1965), and *Manigault v. Springs*, 199 U.S. 473, 480-81 (1905), the dissent asserts that it is not

*     *     *

For these reasons, the State has not carried its burden of showing a significant and legitimate public purpose underlying Senate Bill 2289. The district court thus did not err in concluding that the manufacturers were likely to succeed on the merits of their Contract Clause claim. The State does not challenge the scope of the preliminary injunction, so the question whether it should be limited to retroactive applications of SB 2289, or to certain provisions of the law, is not presented at this juncture. The motions to supplement the record are denied. The district court's order granting a preliminary injunction is affirmed.

SHEPHERD, Circuit Judge, dissenting.

I respectfully disagree with the Court's conclusion that North Dakota has not met its burden of showing a significant and legitimate public purpose underlying SB 2289. Because this Court has stated that a state's interest in serving its farming and rural communities is "unquestionably significant and legitimate," Equip. Mfrs. Inst. v. Janklow, 300 F.3d 842, 860 (8th Cir. 2002), and SB 2289 sufficiently evinces such a public purpose, I respectfully dissent.

Generally, "the Contract Clause does not prohibit the States from repealing or amending statutes . . . , or from enacting legislation with retroactive effects." U.S.

---

"difficult" for a State to carry its burden of showing a significant and legitimate public purpose, because there is "wide discretion on the part of the legislature in determining what is and what is not necessary." *Post*, at 12-13. These decisions, however, refer to discretion in choosing a means to implement a law's purpose *if* the State is properly exercising its police power—*i.e.*, if the law has a significant and legitimate public purpose. *See Energy Reserves Grp.*, 459 U.S. at 412; *Simmons*, 379 U.S. at 508-09 ("*Once we are in this domain of the reserve power of a State* we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary.'") (emphasis added) (internal quotation omitted).

-11-

Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 17 (1977). A state's exercise of its police power "to protect the lives, health, morals, comfort and general welfare of the people . . . is paramount to any rights under contracts between individuals." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978) (internal quotation marks omitted). It is essential for a state to retain its police power to enact legislation aimed at addressing perceived economic harms "without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from the [legislation] by making private contractual arrangements." U.S. Trust, 431 U.S. at 22. However, state legislation's "sole effect" cannot be "to alter contractual duties." Exxon Corp. v. Eagerton, 462 U.S. 176, 192 (1983); see also City of El Paso v. Simmons, 379 U.S. 497, 509 (1965) (noting that "[i]t is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts" (alteration in original) (citation omitted)).

Although SB 2289 substantially impairs preexisting contractual obligations between farm implement dealers and farm equipment manufacturers, such an impairment is not fatal where the state shows it has "a significant and legitimate public purpose" for the impairment. Energy Reserves Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411 (1983); Equip. Mfrs. Inst., 300 F.3d at 859-60. State legislation that substantially impairs preexisting contracts between private parties must be "enacted to protect a broad societal interest rather than a narrow class." Allied Structural, 438 U.S. at 249. The legislation must be "addressed to a legitimate end[.]" Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 438 (1934). This is not a difficult burden for a state to meet. A state's "economic interests . . . may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. . . . Once we are in this domain of the reserve power of a State we must respect the wide discretion on the part of the legislature in determining what is and what is not necessary." City of El Paso, 379 U.S. at 508-09 (citation omitted) (internal quotation marks omitted). In other words, "courts

-12-

ordinarily will not interfere with" the legislature's wide discretion in this area. Manigault v. Springs, 199 U.S. 473, 480-81 (1905).[3] Requiring a significant and legitimate public purpose for substantially impairing preexisting contractual rights between private parties simply "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." Energy Reserves, 459 U.S. at 412.

The Court today employs an approach that second-guesses the North Dakota legislature's sound judgment and unnecessarily heightens the state's burden. The Court faults the legislature for not including "well-supported findings or purposes within" SB 2289 and finds the legislators' statements in the official legislative record to be "insufficient." Supra, at 9. I respectfully disagree. In enacting SB 2289, the legislature was pursuing a broad societal interest.

*First*, in enacting legislation, the North Dakota legislature is presumed to have acted in favor of the "[p]ublic interest . . . over any private interest." N.D. Cent. Code § 1-02-38(5). Undoubtedly, the legislature believed SB 2289 benefitted the

---

[3]The Court states that City of El Paso and Manigault simply "refer to discretion in choosing a means to implement a law's purpose *if* the State is properly exercising its police power—*i.e.*, if the law has a significant and legitimate public purpose." Supra, at 10 n.2. But neither case support that interpretation. The Supreme Court has said very little about a state's burden to show a significant and legitimate public purpose behind legislation that substantially impairs preexisting contracts between private parties. In Energy Reserves, it said a state has to *identify* such a public purpose before a court addresses the final step of the Contract Clause analysis, and found "little doubt about the legitimate public purpose behind the" Kansas legislation at issue there. 459 U.S. at 412, 417. Notably, the Supreme Court found it relevant that there was no "indication that the Kansas political process had broken down." Id. at 417 n.25 (citing Note, A Process-Oriented Approach to the Contract Clause, 89 Yale L.J. 1623, 1645 (1980), for the proposition that, "provided 'legislature is functioning properly, selection of a public purpose and determinations of necessity and appropriateness should be left to it'").

public; the legislation enjoyed overwhelming support in both chambers. The North Dakota Senate passed SB 2289 with a vote margin of 46-0, S. Journal, 65th Legis. Assemb., Reg. Sess. 434 (N.D. 2017), and the North Dakota House of Representatives passed SB 2289 with a vote margin of 86-5. H. Journal, 65th Legis. Assemb., Reg. Sess. 942 (N.D. 2017).

*Second*, the title of SB 2289 suggests that the legislation is not solely designed to alter preexisting contracts between private parties. Compare S.B. 2289, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) ("An Act to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair."), with Equip. Mfrs. Inst., 300 F.3d at 861 (concluding that there was no significant and legitimate public purpose in South Dakota legislation titled "An Act to provide certain restrictions for dealership contracts for machinery").

*Third*, although the text of SB 2289 covers dealers and manufacturers and is silent over any benefits for North Dakota's farming and rural communities, that is not fatal. Neither the North Dakota Constitution nor the North Dakota Century Code expressly require that legislation contain either a statement of legislative purpose or legislative findings. Cf. Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528 (1959) (noting that, in the Equal Protection Clause context, "a state legislature need not explicitly declare its purpose" for enacting legislation). Nor does the absence of express text establish that the North Dakota legislature was acting in bad faith. In a Contract Clause challenge, legislative history may be used to ascertain the purpose underlying the legislation at issue. Equip. Mfrs. Inst., 300 F.3d at 860; Deere & Co. v. State, 130 A.3d 1197, 1211 (N.H. 2015). North Dakota permits the use of legislative history in the absence of legislative findings "to determine the evils and objectives at which the legislation was aimed as distinguished from the meaning of the statute." State v. Knoefler, 279 N.W.2d 658, 663-64 (N.D. 1979) (relying on state

-14-

legislature's house and senate agriculture committees' minutes to ascertain the primary purpose of the legislation).

The legislative history underlying SB 2289 reveals that the legislation was designed to accomplish more than one purpose: not only to regulate relationships between dealers and manufacturers, but also to serve the farming and rural communities in North Dakota. North Dakota House Representative Craig Headland stated "that [the loss of farm equipment dealers] would have an impact on the town where the dealer is located." House Agriculture Committee Vice-Chairman Representative Wayne A. Trottier stated that, if farmers cannot "get service and sales, it makes it costlier and more difficult." Representative Dwight Kiefert stated that equipment is purchased "because we can get the service and the parts. Our area dealership closed and it costs more to get service because there is more mileage." Representative Kiefert further stated that "[t]here was a time when things were easy to fix. Now we are dependent to have the dealer come out." And House Agriculture Committee Chairman Representative Dennis Johnson stated that, "[a]s a custom harvestor over the years[,]" he had

> seen from Oklahoma the dealerships that have closed in 25 years. At the end of the day we all need each other. We are still sitting with $4 wheat. We are heading for a train wreck in trying to make this all work. We want to take care of everyone involved: farmers, dealers, and manufacturers.

SB 2289 aspires to benefit the farming and rural communities of North Dakota as well as the dealers that do business there. The legislation aims to preserve the symbiotic relationship between the groups. Farmers rely on having a local dealer for prompt service, especially during harvest. Without a local dealer, farmers must travel farther to purchase equipment and obtain repairs. Moreover, the small towns in North Dakota with dealerships reasonably depend on the employment opportunities that

come with having such dealerships. Depriving North Dakotans of these opportunities results in adverse consequences for the communities where the dealers are located.

The Court states that, "[e]ven if [SB 2289] indirectly might benefit farmers and rural communities, the Contract Clause demands more than incidental public benefits." Supra, at 10. However, the Contract Clause makes no such demand and, if anything, the Court's statement acknowledges that SB 2289 does not exclusively benefit dealers.

The Contract Clause requires that state legislation be "enacted to protect a broad societal interest rather than a narrow class." Allied Structural, 438 U.S. at 249. Here, SB 2289 aspires to benefit a broad class: the farming and rural communities of North Dakota as well as the dealers that do business there. It is simply irrelevant whether the benefits to that broad class are incidental. Other than prohibiting state legislation exclusively designed to alter contractual duties, the Contract Clause places no limitations on a state's ability to exercise its police power "to protect the lives, health, morals, comfort and general welfare of the people," id. at 241 (internal quotation marks omitted), much less the manner in which a state chooses to implement that power. The Contract Clause requires that state legislation be "addressed to a legitimate end[.]" Home Bldg., 290 U.S. at 438. And we have already determined that a state's interest in serving its farming and rural communities is "unquestionably significant and legitimate," Equip. Mfrs. Inst., 300 F.3d at 860, irrespective of whether the benefits to them are incidental.

In Equipment Manufacturers Institute, this Court was very clear as to why the South Dakota legislation at issue there had no significant and legitimate public purpose: the state produced no evidence of the advancement of a broad societal interest and, indeed, conceded that the legislation's "purpose [was] to level the playing field between manufacturers and dealers." Id. at 860-62. Accordingly, "[i]t [was] clear that the only real beneficiaries under the [South Dakota legislation were]

the narrow class of dealers of agricultural machinery." Id. at 861. Without its readily apparent and exclusively protectionist features, the South Dakota legislation would have fared better. See Exxon Corp., 462 U.S. at 191-92 (distinguishing a permissible law "impos[ing] a generally applicable rule of conduct designed to advance 'a broad societal interest,'" from an impermissible law with the "sole effect" of "alter[ing] contractual duties" (quoting Allied Structural, 438 U.S. at 249)).

Ensuring that North Dakota's agriculture industry, a large component of its economy, is stable and beneficial for all of its participants is squarely within the province of the North Dakota legislature, notwithstanding the imperatives of the Contract Clause. See Farmers Union Oil Co. v. Allied Prods. Corp., 162 B.R. 834, 841 (D.N.D. 1993) ("[I]t is undisputed that North Dakota's economy is heavily dependent on agricultural production."); cf. Hall GMC, Inc. v. Crane Carrier Co., 332 N.W.2d 54, 61 (N.D. 1983) (finding significant and legitimate public purpose behind North Dakota statute protecting farm equipment distributors because a farm equipment "distributor service is a substantial public need in [North Dakota's] economic system").

Because the "sole effect" of SB 2289 is not "to alter contractual duties[,]" Exxon Corp., 462 U.S. at 192, we should not second-guess the legislature's sound judgment. See Mascio v. Pub. Emps. Ret. Sys. of Ohio, 160 F.3d 310, 314 (6th Cir. 1998) (refusing to "question the legitimacy of the purposes put forward" by the Ohio legislature); Kendall-Jackson Winery, Ltd. v. Branson, 82 F. Supp. 2d 844, 875 (N.D. Ill. 2000) ("Unquestionably, the state interests served by a strong local distributorship network are substantial, and a judgment by the Illinois legislature that that interest is best-served by prohibiting termination of distributorships except for good cause is beyond challenge."); Deere, 130 A.3d at 1211-12 (stating that it would not "second-guess [the New Hampshire legislature's] determination[,]" refusing to "require of the legislature courtroom factfinding[,]" and stating that it "will uphold

a legislative choice based on rational speculation" (internal quotation marks and citations omitted)).

The Court is unwilling to defer to the North Dakota legislature's judgment as to *why* it enacted SB 2289 but would give "complete deference" to a legislature's assessment that a law "is reasonable and necessary to serve an important public purpose[,]" U.S. Trust, 431 U.S. at 25-26, or, in other words, "the means chosen to implement" the purposes behind the law. Energy Reserves, 459 U.S. at 418; see also Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 506 (1987) (refusing "to second-guess the [Pennsylvania legislature]'s determinations" about "the most appropriate ways of dealing with the problem"); Home Bldg., 290 U.S. at 447-48 ("Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."). However, by not deferring to the legislature, the Court substitutes its own judgment for that of the legislature. Underscoring the Court's unusual approach today is the fact that the Supreme Court has very rarely— and perhaps in only a single instance—invalidated state legislation for not having a significant and legitimate public purpose. See Energy Reserves, 459 U.S. at 412 n.13 (noting that in Allied Structural, the Minnesota legislature "had not acted to meet an important general social problem" because the statute at issue "had a very narrow focus" and, indeed, "may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired").

Because the North Dakota legislature was pursuing a broad societal interest in enacting SB 2289, the state has met its burden of showing a significant and legitimate public purpose underlying the legislation. Accordingly, the district court abused its discretion in entering its preliminary injunction upon concluding that the appellees were likely to prevail on the merits of their Contract Clause claim and, therefore, the preliminary injunction should be vacated. I respectfully dissent.

———————————————————

-18-